THE SCHOONER CATHARINE, HER TACKLE, &C., STARKS W. LEWIS AND OTHERS, OWNERS AND CLAIMANTS, APPELLANTS, v. NOAH DICKINSON AND OTHERS, LIBELLANTS.

In cases of collision, where the injured vessel has been abandoned, the measure of damages is the difference between her value in her crippled condition and her value before the collision; and this is to be ascertained by the testimony of experts, who can judge of the probable expense of raising and repairing the vessel.

But where the vessel has been actually raised and repaired, the actual cost incurred is the true measure of indemnity.

Where two sailing vessels were approaching each other in opposite directions, one closehauled to the wind, and the other with the wind free, the weight of evidence is, that the vessel which was closehauled, luffed just previous to the collision. This was wrong; she should have kept her course.

The other vessel had not a sufficient look-out; the excuse given, namely, that all hands had, just previously, been called to reef the sails, is not sufficient.

Both vessels being thus in fault, the loss must be divided.

THIS was an appeal in admiralty, from a decree of the circuit

court of the United States for the southern district of New York.

It was a case of collision which took place on the 21st of April, 1853, near Squam Beach, between the schooner San Louis, on a voyage from Jersey City to Philadelphia, and the schooner Catharine, bound to New York.

The facts in the case are stated in the opinion of the court.

It was argued by *Mr. Cutting*, for the appellants, and submitted on a printed argument by *Mr. Field*, for the appellees.

The points made on behalf of the appellants were : —

1. No proper or sufficient look-out was kept on board of The San Louis; and she neither carried nor showed any light.

2. Although the witnesses on board of The San Louis contradict each other in the most material facts, the conclusion from all the evidence is, that the man at the wheel, instead of keeping his course, or keeping away, undertook to cross the bows of The Catharine; whatever may have been his object, he improperly luffed, and brought The San Louis into the wind, directly athwart the bows of The Catharine, and thus produced the collision.

3. The Catharine was in the act of reefing, and had the look-out usual in that trade when reducing sail.

4. The rule of damages is erroneous. The Catharine was liable, *in rem*, for the damage directly occasioned by the collision. Instead of being condemned for the expenses of getting The San Louis afloat, and the cost of repairs, she is charged with the full value of The San Louis, less only a trifling sum, for which her owners, without notice to the appellants, sold and transferred her.

*Mr. Field* made the following points : —

I. It is established by the proofs, that The San Louis was sailing down the coast closehauled to the wind, having her starboard tacks on board, and that The Catharine was at the leeward, coming up the coast, with the wind free, having her larboard tacks on board; that The Catharine had no look-out; that her crew were engaged in reefing, and had been engaged for twenty minutes or half an hour, during which time the look-out was not kept; that the captain took the wheel at eight o'clock, but left it alone once or twice ; that the course of The San Louis was not changed until the collision was inevitable, when the mate put the wheel down, hoping to lessen the blow, but the time was too short for the vessel to feel the change; that the course of The Catharine was changed, so as to bring her head more towards the shore, and that she then ran into and destroyed The San Louis.

II. When one vessel runs into another, the presumption is that the colliding vessel is in fault.

III. In this case, not only is this presumption not repelled, but there are several other reasons positively shown, why The Catharine and her master should be held responsible for the collision.

1. She had the wind free, and her larboard tacks on board, and according to well settled rules, should have given way for The San Louis, which was closehauled, and had her starboard tacks on board. If The Catharine had then given way, the collision would not have happened. St. John *v.* Paine, 10 How. 581.

2. Even if the Catharine had kept on her course, the collision would not have happened; but her course being altered by heading more towards the shore, she struck The San Louis with full head on.

3. If The Catharine had had a look-out, The San Louis would have been seen, (for it is certain that vessels could be seen at least half a mile,) and the collision would not have happened. It is no excuse to say that The Catharine was reefing, and therefore had a right to call away her look-out, for the preponderance of testimony, as well as the dictates of prudence, show that the look-out must be kept even when reefing, especially in a place crowded with vessels; and, besides, The Catharine had no sufficient cause for reefing. The wind did not require it; and she was reefing merely to avoid getting to Sandy Hook before morning.

4. If the master of The Catharine had not left her helm, it is probable the collision would not have happened. To abandon the helm, as he is proved by his own witnesses to have done, once or twice, was an act of inexcusable carelessness.

5. The appellant case assumes certain facts which are entirely unfounded.

IV. Any of the foregoing reasons was sufficient to entitle the libellants to judgment in their favor.

1. The San Louis did not luff "across The Catharine's bows." The helm of The San Louis was not put down until the moment before the collision, when it was inevitable that The Catharine would strike her. This is the positive testimony of the mate, Mr. Williams, who held the helm, and who, of course, knew. Mesick was forward, and could not know the fact as accurately as the mate. Besides, Mr. Williams says, The San Louis had scarcely felt the movement of the wheel, when the Catharine struck her. Capt. Goodspeed's evidence refers only to the time when the two vessels were together so completely that they seemed to be but one.

2. The San Louis was not heading off the shore. She was

pointing her bows in shore ; though she constantly fell off bodily, her head was for the land. It was impossible, therefore, that The Catharine should get round to her starboard side. If The San Louis had pointed her bows off the shore, she would have had the wind abeam. All the testimony shows, that she was close-hauled to the wind, and therefore moving on a line forming an acute angle with the line of The Catharine, the angle opening towards the shore.

3. The Catharine was not "to windward of The San Louis." The 4th allegation of the libel states that The San Louis was inside of The Catharine at the time of the collision. This is not denied by the answer. And according to the proofs, The San Louis, at 8 o'clock, must have been from half a mile to a mile to the windward of The Catharine.

Mr. Justice NELSON delivered the opinion of the court.

This is an appeal in admiralty from a decree of the circuit court of the United States for the southern district of New York.

The libel charges, that on the night of the 21st April, 1852, the schooner San Louis, laden with a cargo of stone, was sailing down the coast below the bay of New York, bound for Phila-delphia, and while off Squam Beach, on the Jersey shore, the schooner Catharine, coming up the coast, bound for the port of New York, then and there with great force and violence ran into and upon her, breaking through her side, so that she soon filled with water, and sunk. That The Catharine had a fair wind and ample sea-room, while The San Louis was beating against the wind, and was inside of The Catharine, and standing off the shore. That The Catharine had no watch or person on the look-out at the time of the collision; and that it was occasioned by the improper and unskilful management of the persons on board engaged in navigating her. That she luffed, and struck the San Louis about midships with head on.

The answer of the respondents, owners of The Catharine, admit The San Louis was sailing down the coast at the time and place mentioned; and that The Catharine was coming up the same, bound for the port of New York; but deny that she ran into The San Louis; but charge that she ran across and afoul of the bows of The Catharine, which occasioned the collis-ion ; that the wind was in a quarter that enabled The San Louis to keep her course full down the coast without keeping off shore ; they insist that The Catharine had the usual watch set before and at the time of the collision; and they deny that it was occasioned by reason of the unskilfulness or mismanagement of those on board of her, but was the result of want of care and mismanagement in navigating The San Louis. They deny that

The Catharine luffed, as charged in the libel; but charge that The San Louis luffed and came across the bows of The Catharine. The district court rendered a decree for the libellants, and referred the question of damages to a commissioner. The decree was affirmed in the circuit court. The proofs before the commissioner to ascertain the amount of the damages, consisted principally of testimony as to the value of The San Louis previous to the collision; and as to her estimated value in her sunken and disabled condition in the water on the beach; the difference constituting the measure of damages allowed. She was sold by one of the owners, a few days after the accident, while lying on the beach, for $140; and which, upon the weight of the proofs as produced, was her then estimated worth. Her cargo of stone was afterwards taken out, and the vessel raised and brought to the port of New York and repaired. The expense of raising and repairing her seems not to have been a subject of inquiry.

The commissioner reported damages to the amount of $6,200, which report was confirmed.

1. As to the damages.

The principle that appears to have governed in the examination of the witness in respect to this branch of the case, as well as the commissioner in arriving at the amount of damages reported to the court, we think, upon consideration, is not maintainable. That principle seems to have been, to ascertain from the opinion of witnesses, experts as they are called, though it is not clear they were of that character, the value of the vessel in her sunken and disabled condition as she lay on the beach after the disaster, and to deduct that sum from the sound value before it occurred, the difference being the measure of the damage; in other words, that the inquiry must be confined to the condition of the vessel at the time of the collision, and in her then state; that the owner had a right to abandon her as a total loss, and look to the wrongdoer for compensation, as then estimated. Acting upon this view, the libellants sold the vessel in her disabled state for what they could get, and claimed, and have received, the sound value, less this amount.

It is true, that where a vessel has been run down and abandoned, never having been raised and repaired, but left to decay upon the beach, evidence of the nature and character of that given in this case must necessarily be admissible. That is, the damage sustained must be ascertained by the testimony of witnesses experienced in matters of this kind, who are competent to speak as to the practicability of raising and repairing the vessel, and of the expense attendant thereupon, this expense constituting the principal ingredient of the damage proper to be

allowed; but they should be witnesses whose occupations and experience enabled them to express opinions of the feasibility of raising the vessel, and to make estimates of the probable expense of the same; and, also, of the expense of the necessary repairs, upon which the court might rely with some confidence in making up its judgment. Loose general opinions on the subject, entitled to very little more respect in the ascertainment of facts than the conjectures of witnesses, are of themselves undeserving of consideration.

But where the vessel has been raised and repaired, or is undergoing repairs, as in the case of The San Louis, there is no necessity for resorting even to the opinion and estimates of experts, as to the probable expenses, for as to these the reasonable expenses incurred in raising and repairing her are matters of fact that may be ascertained from the parties concerned in the work. The libellants, instead of the examination of witnesses, as to their opinion of the amount of the damage from an inspection of the vessel as she lay upon the beach, should have inquired into the actual cost of raising and repairing her, so as to have made her equal to the value before the collision. This would have been the proper mode by which to have arrived at an indemnity to the extent of the loss sustained, which is the true measure of damages in these cases. 13 How. 101; 110.

We think, therefore, that the rule adopted in ascertaining the measures of damages in this case was erroneous.

The next question in the case is more difficult.

The New Jersey coast below Sandy Hook bears southwesterly and nort' easterly, along which these vessels were sailing. The wind was southwesterly, with a pretty strong breeze; The San Louis closehauled, passing down the coast, and The Catharine with the wind free passing up it, making for the Hook. There had been a fall of rain during the evening, but between eight and nine o'clock, when the collision happened, the weather had partially cleared up. The night was cloudy, but some stars were visible. The San Louis was sailing at the rate of six knots the hour; and as The Catharine had the wind free, her speed must at least have been equal if not greater.

The master of the schooner Goodspeed, which vessel was in company with The San Louis from Jersey City, states that a schooner, which it is admitted was The Catharine, passed him a little after eight o'clock, some quarter of a mile to the windward, heading to the westward of her course to the Hook, which was in shore; that at this time The San Louis was from three quarters to a mile astern of him, a little to windward. The Catharine had a light; the San Louis had not.

Messick, the look-out on The San Louis, states that he saw

The Catharine half a mile ahead; he supposes about half a point on their lee bow. " I suppose," he says, " when I first saw The Catharine she was heading to the northward. I sung out to the mate at the helm to luff; he did so, and brought The San Louis into the wind; that The Catharine then luffed also, and ran into us abaft the chains."

Now, if the master of The Goodspeed is not mistaken, and he is an indifferent witness, it is difficult readily to assent to the statement of Messick as to the relative position of the two vessels; for if The Catharine passed The Goodspeed half a mile to the windward, and The San Louis was astern, nearly in the track of the latter, it is not very probable that, in the short distance she had to pass in her course before meeting The San Louis, she had so far diverged to the leeward as to overcome this half mile, and to have crossed her track. The vessels must have met at least within half a mile from the point where The Catharine passed The Goodspeed. The master of The Goodspeed says The Catharine was not only half a mile to the windward, but that she was heading to the west of her course to the Hook.

According to the settled rules of navigation, it was the duty of The San Louis, when she first saw The Catharine, which had the wind free, she being closedhauled, to have kept on her course; the manœuvre of luffing into the wind, as soon as she saw that vessel, was improper, and subjects her to the charge of unskilful navigation, unless justified by special circumstances existing at the time. Here, the circumstances tend rather to aggravate than justify the error, as the improper manœuvre may have led to the collision, and probably did, if The Catharine at the time was to the windward.

Williams, the mate of The San Louis, who was at the wheel, differs materially in his testimony from Messick. He states, when he first saw The Catharine, " he spoke to the man at the bow; he said, keep your course, and you will go clear. I did keep my course; asked the man at the bow if he could see her; he said that he could; he told me to keep my course; I did not alter my course; steered as close to the wind as I could; did not see much more of The Catharine till she struck us." He further states, that when about three rods from The Catharine, she luffed and was coming into them; that he then put his wheel down.

If this account of the management of The San Louis could be confidently relied on, there would be no great difficulty in charging the other vessel with the fault of the collision. But it is admitted that Messick was the proper person, under the circumstances, to give the orders to the mate at the wheel. Williams himself assumes this in his testimony; and Messick is

very particular as to the orders given. On his cross examination he says: " I saw The Catharine across one point of the bowsprit, inside the stays; right away then I gave the mate the order to luff; he did it right away. She minded her helm readily."

The difference is very material; for whether fault or not is to be imputed to The San Louis, depends upon the fact whether she is chargeable with the manœuvre testified to by the look-out. We think, under the circumstances in which he was placed, his account of the transaction is entitled to the most weight. Having given the order, and seen that it was obeyed, and being at the time in charge of the navigation of the vessel, he cannot well be mistaken. Even the contradiction between the two witnesses is calculated to cast a doubt over the proper management of the vessel in the emergency.

The order to luff, itself, was a clear violation of the duty of The San Louis; but, in this instance, if the master of The Goodspeed is not mistaken, it probably produced the disaster. As to The Catharine, we are not satisfied that she had a proper lookout on the vessel at the time of the collision. The excuse given is, that all hands, a short time previously, had been called to reef the sails, and some evidence is given to prove that this is customary on vessels of this description. However this may be in the daytime, we think that such custom or usage cannot be permitted as an excuse for dispensing with a proper look-out while navigating in the night, especially on waters frequented by other vessels. Under such circumstances, a competent lookout, stationed upon a quarter of the vessel affording the best opportunity to see at a distance those meeting her, is indispensable to safe navigation, and the neglect is chargeable as a fault in the navigation.

Our opinion therefore is, that the decree below was erroneous, and should be reversed.

Upon this view of the case, it becomes necessary to settle the rule of damages in a case where both vessels are in fault.

The question, we believe, has never until now come distinctly before this court for decision. The rule that prevails in the district and circuit courts, we understand, has been to divide the loss. 9 Law Rep. 30.

This seems now to be the well-settled rule in the English admiralty. Petersfield *v.* The Judith, Abbot on Sh. 231, 232; The Celt, 3 Hagg. 328, n.; The Washington, 5 Jurist, 1067; The Fiends, 4 E. F. Moore Rep. 314, 322; The Seringapatam, 5 Notes of Cases, 61, 66; Vaux *v.* Salvador, 4 Ad. and Eli. 431; The Monarch, 1 Wm. Rob. 21; The De Cock, 5 Monthly Law Mag. 303; The Oratava, 5 Ib. 45, 362.

Under the circumstances usually attending these disasters, we

think the rule dividing the loss the most just and equitable, and as best tending to induce care and vigilance on both sides, in the navigation.

### *Order.*

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the southern district of New York, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said circuit court in this cause be and the same is hereby reversed with costs, and that this cause be and the same is hereby remanded to the said circuit court for further proceedings to be had therein, in conformity to the opinion of this court, and as to law and justice shall appertain.