## THE UMBRIA.

### THE CHARLES E. MATTHEWS.

(District Court, S. D. New York. June 26, 1906.)

COLLISION—DAMAGES—COST OF REPAIR.

Where the testimony produced by the owner fairly establishes the amount actually expended in repair of a vessel injured in collision, but it is not satisfactorily shown that such amount was the fair and reasonable cost of the repairs called for by the survey, resort may be had to the

estimates of competent experts called by claimants to determine the amount properly allowable as damages for the collision.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, § 265.]

In Admiralty. On report of commissioner awarding damages for collision.

Benedict & Benedict, for libellant.

Lord, Day & Lord, and Goldthwaite H. Dorr, for the Umbria.

Wing, Putnam & Burlingham, for the Matthews.

ADAMS, District Judge. On the trial of this action it was determined that both the Umbria and the Matthews were in fault for the collision, and it was referred to a commissioner to ascertain the damages. Proof having been given, it was reported by him that damages were sustained by the libellant amounting to $15,739.71. Of this amount $10,142.59 were reported as the amount required to make the necessary collision repairs.

In this report the commissioner, after analyzing the testimony with respect to repairs and concluding the libellant's proof was deficient, said:

"The bill not having been proved, it cannot be allowed as presented. It is clear, however, that extensive repairs were made, and the position of counsel for both claimants is that the bill should be allowed less a deduction of 25%. The testimony of the witnesses called by claimants justifies such deduction, as far as their estimates go, even if allowance be made for a tendency on the part of expert witnesses to lean towards the party who calls them. But the cost of rebuilding the scow in 1901 should furnish a useful standard of comparison, although reasonably precise evidence of such cost has not been presented. Mr. Packard, Jr., said that at that time they 'rebuilt her from keelson up, leaving nothing there but the bottom, including the keelson.' He also said that his company kept no books, but he thought their records would enable him to get the cost of that work approximately. He did not furnish it, however. Mr. Packard, Sr., said that it cost 'somewhere about ten to eighteen thousand dollars,' according to his best recollection. Even if we accept the highest amount given by Mr. Packard, Sr., the bill under consideration would appear to be excessive by comparison; inordinately so, if we divide the difference between his maximum and minimum and assume the cost to have been $14,000; and libellant cannot justly complain if such amount be adopted, since it could have furnished the correct amount had it seen fit to do so.

"I therefore allow $10,142.59 for repairs, that being the amount of the bill less a deduction of 25%."

Upon the report being presented for confirmation the libellant applied for leave to have the reference opened for the purpose of taking further testimony. This motion was granted and another report has been made on the question of recovery for repairs, in which the commissioner says:

"This cause was originally referred to me, to ascertain the amount of libellant's damages, by the interlocutory decree entered May 11th, 1905, and I filed my report January 31, 1906, by which I found, among other things, that a bill for repairs to libellant's scow, amounting to $13,523.45, had not been proved, and that on the testimony then before me the amount appeared to be excessive for repairing the damage suffered in the collision. I allowed $10,-142.59 for repairs, which was the amount of the bill less a deduction of 25%. This sum was conceded by counsel for both the libelled vessels. Subsequently, on libellant's motion, the reference was re-opened by the court to permit fur-

ther testimony by an order made February 28, 1906, and both sides have presented additional proofs under that order.

To prove the bill, libellant has adopted a method referred to by the Circuit Court of Appeals in The Norma, 68 Fed. 509, 15 C. C. A. 553, following the rule laid down in Mayor v. 2nd Ave. R. Co., 102 N. Y. 572, 7 N. E. 905, 55 Am. Rep. 839. In the former case the court said that 'it was competent to prove the charges by the testimony of the bookkeeper who transcribed them from the temporary memoranda (which were substantially slate entries) supplemented by testimony of the persons who made the memoranda that such memoranda, to their own knowledge, were correct.' It was held that the proof was insufficient where the bookkeeper, who had but little personal knowledge of the items, and only general knowledge as to the fact that the men were working on the job, made up his account from memoranda furnished him by the workmen, the memoranda being assumed by him to be correct and destroyed by him as soon as entered in the books; the court stating that the difficulty was that no one testified of his own knowledge, and that although it would probably be impossible to produce specific evidence of the accuracy of each memorandum, because of its destruction, libellant should at least have called the workmen who made the memoranda to testify that all memoranda made by them, and turned in to the bookkeeper during the period, correctly set forth the hours they worked and the materials they used; adding, 'Without such proof the charges are supported only by hearsay evidence.' In the present case, also, the memoranda of the workmen and heads of departments at the shipyard have been destroyed. It is apparent that strict compliance with this stringent rule is most difficult, and at times might be impossible, where the job is a large one on which many workmen from a shifting force are engaged.

Libellant called the foreman on the job, the heads of various departments at the shipyard, the store-keepers there, and the time-keeper and book-keeper. The testimony of these witnesses, or at least some of them, was to the effect that Lynch, who was employed by and represented libellant, and testified on the first reference, kept track of the work, and compared his record of labor and materials with theirs.

Cross, the foreman on the job, who had charge of the dry dock where the scow was repaired, testified he was there at all times while the work was in progress, with the exception of a couple of days at the end, that he laid out the work for the men, measured the lumber used, and made memoranda of it, and handed in his memoranda to Olson, the book-keeper and time-keeper, from day to day, and that his memoranda correctly reported the lumber that actually went into the repairs. Olson testified to receiving these daily reports, but said that sometimes there were memoranda, and sometimes the reports of Cross were oral, depending upon whether there were few or many items. This variance between them, on which counsel for the Umbria dwells, seems to me to be of slight importance.

Schenck, the foreman of the caulkers, testified that he decided what materials were necessary in his line, that these consisted of oakum, pitch, paint, pitch mops, brushes, etc., kept in a storehouse of which one Larkin had charge, that he himself procured such supplies from the storehouse, weighed them himself, gave the weights to Larkin, and carried the materials to the scow, and that they actually went into the job. Larkin testified that he did the weighing as stated by Schenck, reported the quantities accurately, and handed in a daily memorandum to Olson; and this was confirmed by Olson.

Monroe, the head fastener, whose department included 'all iron to be driven and all holes to be bored,' testified that when he wanted iron he ordered the men to go to the blacksmith's, about 100 yards away, and had it cut, weighed and charged, the men weighed it themselves, the quantity was marked down by them on a blackboard, the weights were put down accurately in every instance, sometimes he would go with the men, sometimes he would go afterwards, most of the time, he thought, he saw them do the cutting. The largest part of the iron used he saw weighed. Larkin, from whose storehouse these materials were taken, testified that the men weighed accurately, he always looked at the scales, he took the weight down in every case, turned the memo-

randa in to Olson daily, and the memoranda were correct. Horner, another storekeeper, who had charge of the pipe and pipe fittings, packing, machinery steel, nipples, drills, steam gauges, boiler fittings, boiler tubes, castings, grate bars, galvanized iron pipes, testified that he knew such articles were used on the scow, that he weighed most of the things himself, and in some instances the men themselves did the weighing, but he immediately made a memorandum of the correct weight after being told by them. His knowledge that the articles he referred to were used in the scow was derived from the men, as he did not go aboard to see. He turned in, his memoranda to Olson daily. Olson testified that he received the memoranda of Larkin and Horner for each day's materials.

Anderson, head blacksmith, testified that he made correct memoranda of the time of the men and the material in his department, and Olson took these up daily. He said, however, that his work was confined to the shops. and he knew when anything was for the scow because the men told him; and he added that he could not be misled, because his experience enabled him to know whether the work was for a vessel or for a scow. Olson confirmed Anderson's testimony as to receiving the memoranda from him.

Preacher, the master machinist, testified that the pump, injectors and piping were overhauled by his department, new piping put in, the boiler re-tubed, and other work done, that the record of the material in his department was kept by Horner, the men made out their time on printed forms used for that purpose, these were taken up by Olson daily and examined by himself, he went over them and the records of material with Olson, followed the work up, knew what each man was doing, and that the slips were made out correctly. Olson testified to receiving these slips.

Besides testifying that he received daily the memoranda and slips hereinbefore referred to, Olson said that each morning he went over the place to ascertain what men were at work and what they were engaged on, and repeated this trip several times a day, he himself noted the time of the carpenters and laborers, obtained information as to caulkers from the head caulker, which he confirmed by his own observation, and of the blacksmith's helpers from the head blacksmith, observed what machinists were at work as well as receiving the slips, obtained from the head boiler-maker the time of his men, entered everything in a memorandum book from which the entries were carried to the blotter day by day, and in this blotter also entered the contents of the memoranda and slips already referred to as received by him from heads of departments and workmen. All these entries were correctly made. he said, and he compared his record of time with Lynch each day, and adjusted with him any variance between them. He also testified that each day's blotter entries were copied on a billhead as the work went on, so that as soon as the job was finished the entire bill was ready, and that this was in accordance with their custom. He stated that the items on the bill are correct copies from the blotter. On cross-examination, he said that men were shifted from one job to another as convenience required, and his testimony indicated that to some extent he inquired of the men themselves as to who worked on the job and the time each man was employed on it. He said that his work was really clerical, to keep the books straight and put down what was told him.

The testimony of these witnesses is criticised by counsel for the Umbria as largely hearsay, and he contends that the bill has not been proved by competent testimony. I think there is sufficient competent testimony to make out a prima facie case that the labor and materials itemized in the bill were bestowed upon the scow; and if there were satisfactory proof that the account represented the fair cost of making the repairs called for by the survey, I should consider that the bill ought to be allowed in full. The proof most open to criticism is that relating to carpenters and laborers; but I do not consider that Olson's testimony as to their time is hearsay because the men were not under his eyes all the time. His frequent trips about the yard, and his own observation, although assisted by inquiries of the men, enabled him to keep a reasonably correct record of their time. But this, as well as other items in the bill, are supported to some extent by the testimony of Lynch on the first

reference, which I held in the original report was not sufficient in itself to prove the bill. The circumstance there alluded to that the entries in Lynch's books accorded so closely with the items in the bill as to suggest copying from the same source might be regarded as explained by the testimony on the re-hearing that it was Lynch's practice to compare his record with that of the others, and adjust any discrepancies there may have been; although it should be added that Lynch was absent part of the time. Labor and material which appeared to have been recorded by him on the faith of statements made by others, has now been proved by competent testimony. He also testified that he personally made a record of the carpenter work from his own observation, and this testimony, although its value was impaired on cross-examination, is to be considered in connection with Olson's testimony on that subject. I do not think that I should aggravate the difficulties of proving the bill under the rules laid down in The Norma by a captious criticism of the testimony.

It is insisted by counsel for claimants that, assuming the bill in fact represents what was done upon the scow, either the work was done extravagantly, or the bill includes repair work outside the survey, not necessitated by the collision. In my original report I stated that Mr. Packard, Jr., vice-president and treasurer of libellant, testified that in making the repairs the survey was followed with some slight changes. Rankin, superintendent of the Perth Amboy Company, testified on the first reference that there were a few important departures from the survey, which he described and which are set forth in the original report (pages 16–17). He also testified that the lumber saved by changes was about equal to the lumber used for the additions, and the change in the keelson work was a saving on both labor and material. Morrison, the foreman on the job, testified on the re-hearing that no work was done outside the survey, and that there was no work except what was necessary to repair the damage. Mr. Packard, Sr., also testified to the latter fact on the first reference, but Mr. Packard, Jr., said that there was some additional work for which a separate bill was rendered. This bill has not been produced.

Lang and Hoyt, called by claimants on the first reference, gave estimates of the amount of labor and material which would have been required to carry out the survey, and their testimony is discussed on pages 17–20 of the original report. They did not make estimates of the fair cost of the repairs, but Lang was again produced as a witness for claimants on the re-hearing, and testified that in the winter and spring of 1905, $10,534 was the fair and reasonable cost of doing the work called for by the survey, with the changes indicated by Rankin, and including a renewal of certain planks which the survey did not clearly indicate were to be renewed. This amount, he said, would allow a profit of about 13% at his place at Hoboken, but in view of the lower cost of labor at Perth Amboy, and the resulting advantage to the shipwright, there might be a profit of 18% on work there without its being unreasonable. Mr. Packard, Sr., has himself said that he gave the work to the Perth Amboy Company because labor was cheaper there; and that this company had that advantage is the testimony of all the witnesses. Lang's testimony shows that he made a careful and intelligent investigation of the subject, and there was nothing in his cross-examination to impair its substantial accuracy. There were a few items of small importance that he did not consider, some of which he said were not called for by the survey, but there were allowances in his estimate which appear to have been sufficient to cover all proper items.

On the first reference, libellant's principal witness, Rankin, did not dispute the substantial accuracy of the estimates of Lang and Hoyt as based on the survey, and no other shipwright was called to overcome them. Rankin made the general statement that the bill (referring to the first portion, for $13,-255.69) was fair and reasonable, but he testified as follows on cross-examination:

'Q. You have no personal knowledge then as to whether these items are correct in these bills? A. No personal knowledge; I believe those to be correct, for the simple reason that they were checked off every morning with Mr. Packard's man. Mr. Packard had a man on the job all the time and him and our bookkeeper checked the bills up every morning together. Q. You have

no personal knowledge of the matter, just simply your confidence in Mr. Packard's man and—A. And our own man.'

On the re-hearing, although fully advised that claimants intended to continue their vigorous attack on the bill, libellant has called no person in authority at the shipyard, and no shipwright or other experienced and competent person, to sustain the bill or point out errors or fallacies in the figures given by claimants' witnesses, or explain the considerable difference between the bill and what was apparently the fair cost of carrying out the survey. Mr. Runyon, the president of the Perth Amboy Company, with whom the arrangements were made for the repairs, and who, according to Rankin, had knowledge of the work, did not testify on either reference. Certain bids which Mr. Packard, Sr., said on the first reference were received from other builders and exceeded those of the Perth Amboy Company, have not been produced, although their absence was referred to in the original report. Nor has Mr. Packard made a satisfactory explanation of the disproportionate cost of making these repairs as compared with the cost of rebuilding the scow a few years previously.

Libellant's counsel argues that estimates should not be received against a bill for work actually done, and refers to The Catharine, 17 How. 170, 15 L. Ed. 233, and The City of Chester (D. C.) 34 Fed. 429. The former case held that where a vessel damaged in collision had actually been raised and repaired, the district court erred in adopting as the measure of damage the difference between her value immediately before the collision and her value in a sunken and disabled condition as estimated by experts, and that inquiry should have been made as to the actual cost of raising and repairing. The case is not an authority for holding that no inquiry can be made as to the reasonableness of that cost. In The City of Chester, Judge Brown merely held that where an estimate of the cost of repairs was made at the time of the survey at New York, the libellant could not recover the amount of the estimate when he had the repairs made at another place for a less amount, as the rule of damages was complete restitution and the libellant should not be allowed to make a profit out of the transaction. It is difficult to see how a repair bill could be impeached except by resorting to estimates. And in The Robert Hadden (D. C.) 68 Fed. 1017, where a bill of $2,864 for repairs had been actually paid by the libellant, Judge Brown sustained a report allowing only $1,785 because on the evidence the latter sum was the reasonable cost of making repairs.

It is also contended by libellant that the survey should not be regarded as determining the repairs to be made, but the cost of repairing the scow independently of the survey should be considered, and that as a matter of fact, the survey was not followed. But with the exception of Lynch, the testimony of libellant's own witnesses is to the effect that the survey was substantially followed, although on the first reference, after Lang & Hoyt had testified, Rankin, who was the surveyor for libellant and signed the report, was recalled and gave a technical, and not very enlightening, explanation which was intended to show that there were various changes which he had not previously mentioned, and which would account for the excess of labor and material.

Lynch testified:

'Any one looking at the job knew we could shorten the job by doing it in the way we done. Make it less expensive by leaving the survey and doing it in another way.

'Q. Then the changes you made were in the interest of economy on the job? A. Yes.

'Q. It cost less to do it the way you did than the way the survey called for? A. Decidedly.

'Q. Was there any old iron put back? A. Yes.

'Q. Can you tell me about how many tons? A. I can't tell you.

'Q. In a general way? A. We used every particle of old iron that was straight enough to measure figures 18 inches, if we could get a bolt 18 inches out of it, we saved it and used it back.' ·

And Rankin testified as follows on cross-examination, after he had described the additional changes referred to:

'Q. Would you agree with these gentlemen who testify for us, that taking that survey as it is. it calls for about forty to forty-four thousand feet of lumber? A. I think those gentlemen, taking the survey as they saw it, might fairly estimate on that lumber.

'Q. Now, you have come here to-day to tell us there was a lot of work done outside of the survey, have you? A. There is not so very much outside the survey.

'Q. Are we to understand your testimony to-day varies your previous testimony as to that at all? A. Not to any great extent, I don't think.

'Q. Do you remember the last time you were here I asked you with the greatest particularity whether you did anything outside of the survey, do you remember that? A. Yes sir.

'Q. Do you remember you told me in three respects you departed from the survey and in three only? A. Did I say three only?

'Q. Yes; did you mean anything else? A. I don't remember.

'Q. Do you want to change your testimony from that day? A. If I said in three only.

'Q. Three important particulars only; is that right? A. That is right, yes.

'Q. You tried to make a good, honest, fair survey, did you? A. We did to the best of our ability.

'Q. You have often made surveys before? A. A great many.

'Q. You testified, Mr. Rankin, as to these various pieces of work that did not show in the survey. Have you made any estimate—detailed estimate—of the additional lumber that it would require to carry out these various things which you say had to be done and were done and which it was not possible to see in the survey? A. No, I have not.

'Q. So when you say that would account for that 17,000 increase in lumber, it is just pure guess work, you have not reckoned it up. That cost is not based on any detailed working out on how much lumber would be taken out by this work that the survey did not show and how much would be needed for that piece of work? A. I haven't had time to go into these details.

'Q. You have not gone into any detail? A. No.

'Q. Have you described this work in such detail this afternoon that it would be possible to make such estimate? A. I don't think it would, because I told you those are only drawn from memory. They are not from actual measurements.'

My conclusion is that libellant has failed to prove that the amount of the bills is the fair and reasonable cost of repairing the damage caused by the collision, and I find that $10,534, the estimate of Lang, does represent such cost."

The libellant has taken several exceptions to the report as follows:

"The above named libellant hereby excepts to the report of the Commissioner herein filed June 11. 1906, on the following grounds:

First. On the ground that the Commissioner has given preference to an estimate of cost of repairs made by Lang, a witness who never saw the scow, over evidence of the cost of actual repairs. Such estimate is found on page 90 of the testimony on the second reference.

Second. On the ground that the Commissioner admitted, over objection, an improper hypothetical question, and decided the case on the answer thereto. The question was as follows, (p. 89 of Testimony on Second Reference) :

'Q. From your examination of this survey, and from your experience as a shipwright, what do you say would have been the reasonable cost of repairing a mud scow such as this 022 in the winter of 1905, or in the spring of the year, in this port, doing all the work called for by this survey, Exhibit 11, and in addition, whatever is called for by those modifications which I have stated to you?' and the objection thereto being that it does not include all of the work which was actually done on the scow.

148 F.—19

Third. On the ground that the Commissioner found that the libellant has failed to prove that the amount of the bills is the fair and reasonable cost of re pairing the damage caused by the collision.

Fourth. On the ground that the Commissioner found that the estimate of Lang does represent such cost.

Fifth. On the ground that the Commissioner has assessed the amount due libellant for repairs at the sum of ten thousand five hundred and thirty-four dollars, instead of at thirteen thousand five hundred and twenty-two 76/100 dollars."

The difference between the first and second report seems to be that the commissioner instead of deducting 25% from the libellant's bill, has adopted the estimate of Mr. Lang, and this is objected to by the libellant.

In view of the strenuous criticism of the libellant, which contends that it is not allowed the actual cost of collision repairs to its vessel, I have examined the matter carefully and concluded that the commissioner has reached a just conclusion. It does not seem necessary to add anything to what he has said.

The exceptions are overruled.