## THE MARGARET. THE MANCHESTER MERCHANT. THE HARRY M. WALL.

### HUDSON et al. v. INDEPENDENT PIER CO. et al.

Circuit Court of Appeals, Third Circuit.
December 1, 1928.

On Rehearing February 13, 1929.

Nos. 3723, 3724.

Hunt, Hill & Betts, of New York City, and Rawle & Henderson, of Philadelphia, Pa. (John W. Crandall, of New York City, Joseph W. Henderson, of Philadelphia, Pa., and H. Victor Crawford, of New York City, of counsel), for A. H. Bull S. S. Co.

Biddle, Paul, Dawson & Yocum, of Philadelphia, Pa. (H. Alan Dawson, of Philadelphia, Pa., of counsel), for cross-appellees Hudson and Manchester Liners.

Acker, Manning & Brown, of Philadelphia, Pa. (J. T. Manning, Jr., of Philadelphia, Pa., of counsel), for appellees Independent Pier Co. and others.

Howard M. Long, of Philadelphia, Pa., for appellee Sunkett.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. The channel of the Delaware River at the Port of Philadelphia is on the western side of the river, its western edge being the Philadelphia pierhead line. It conforms to a clearly visible inward bend in the shore beginning near the Delaware River Bridge and ending near Cramps' shipyard. It is from 800 to 1,000 feet wide and to the eastward there is still more water for craft not deeply laden.

On January 19, 1926, the American steamship "Margaret," loaded and drawing 18.3 feet aft, left her anchorage off Greenwich Piers and proceeded up the river. The British steamship "Manchester Merchant," having aboard a part cargo and drawing 14 feet aft, left her pier at Port Richmond and proceeded down the river. This was after daybreak and before sunrise. Although both ships had their regulation running lights properly set, lighted and showing as required by law, day had so far advanced that they were not needed for navigation. The weather was clear. The tide was about the end of the flood and the wind was light; neither was a factor in the navigation.

The ships, each with its own pilot and moving under its own power at six or seven knots, observed each other when about a mile apart. Except two steamers bound down stream and a ferry boat bound across

stream which the Margaret passed shortly after starting, the river between the Margaret and the Merchant was clear of shipping. Approaching at half speed, all the time in full view of each other, they exchanged passing signals when about a half mile apart. The Margaret then put her wheel to starboard and the Merchant put hers to port with the result that they laid courses along two sides of a triangle and naturally met at the apex; the stem of the Margaret hit the port beam of the Merchant on her Plimsoll mark precisely amidship and the Merchant, continuing on, came within a few feet of piling up on the piers.

It is hard to believe, yet that is what happened.

As both ships suffered severe damage the proper representatives of each filed a libel against the other charging negligent navigation, and in addition the Margaret, to save herself if the fault should be found to be hers, impleaded the Independent Pier Company, owner of the tug "Harry M. Wall," whose master was navigating the Margaret.

Louis Sunkett, a seaman aboard the Margaret who was injured in the collision, filed a libel against the Merchant, which, by stipulation, will abide the outcome of the litigation between the ships.

At the trial it appeared that four boats were involved in the maneuvers that resulted in the collision—two steamships, the "Margaret" and "Manchester Merchant" and two tugs, the "Harry M. Wall" and the "Bering." All witnesses to the collision produced at the trial were on these boats. While their testimony is directly conflicting and hopelessly irreconcilable, all aboard the respective boats told the same story, that is, the story of their own boat. Therefore to avoid dreary repetition we shall not refer to the witnesses but regard the boats as speaking.

### The Margaret's Story.

It is briefly this: Upward bound she was a little to the eastward of the center of the channel after passing under the Delaware River Bridge. She saw the Merchant up stream two or three points off her starboard bow eastward of the main channel, that is, eastward of deep water. (Whether this was a fact or an optical illusion due to the bend in the river is one of the questions.) She was then about a mile away.

The Margaret, moving at half speed and at all times having the starboard side of the Merchant in view, held to her course in mid-channel until, when half a mile from the Merchant, she gave her a starboard to starboard passing signal by sounding two blasts of her whistle. To this the Merchant responded by an assenting signal of two blasts. To facilitate this agreed maneuver the Margaret, putting her wheel a little to the starboard, bore to her port away from the Merchant. The Merchant, contrary to the starboard to starboard passing signal and instead of bearing to her port away from the Margaret, sheered to her own starboard and westward and took a course directly across the Margaret's bow. The Margaret, a minute before the collision, sounded danger signals, reversed her engines to full speed astern and put her wheel hard aport in an effort to swing her bow to starboard and under the Merchant's stern. All this failing, the Merchant struck the Margaret's stem at a forward angle of about 20°.

The critical points to be noted in the Margaret's story are: (1) Her claimed position in the channel which before the collision she puts to eastward and at the time of the collision in the middle of the channel, (2) the exchange of starboard to starboard passing signals, and (3) the time within which she took measures to avoid the collision then impending.

### The Merchant's Story.

Her story is in all essentials diametrically the opposite of the Margaret's. She says, bound down stream at half speed, she saw the Margaret four points off her starboard bow about a mile away. The Margaret was a little to the eastward of mid-channel at one end of the bend and the Merchant was on the western side of the channel at the other end of the bend and about a ship's length (300 to 360 feet) from the Philadelphia pierhead line. Due to the bend in the channel the positions of the two ships changed as they approached each other until instead of the Margaret bearing on the Merchant's starboard bow she came to bear two points on her port bow. So in that relation when about half a mile apart the Merchant gave the first passing signal—port to port—by sounding one blast of her whistle. To the Merchant's signal of one blast the Margaret replied by two blasts. A minute later and when about a quarter of a mile apart the Merchant blew a second signal of one blast and again the Margaret made a two-blast reply. At that time the Merchant was about 300 feet off the Pennsylvania pierhead line. A minute or so later she put her helm hard aport, swung to starboard, and when about 500 feet from the Margaret went full speed

astern, blowing danger signals. A minute after that the ships struck at a point about 100 feet off the Pennsylvania pierhead line; the Merchant, having let go her anchor, fetched up within a few feet of a pier.

In the Merchant's story, as in the Margaret's, important points to be noted are: (1) Her claimed position which she puts well to the westward of the channel, (2) the exchange of signals, in her story an exchange of conflicting signals, and (3) the time within which she took measures to avoid the collision then impending.

The uncertainty that arises from the stories told by the two ships is due to the inclination of seamen, perhaps through a sense of loyalty, to swear by their own ship and to the difficulty in finding the truth when, as here, two groups of witnesses of equal credibility and equally interested give testimony that is wholly contradictory. Light therefore must be sought elsewhere. So we turn to the tugs to hear what they have to say.

### The Wall's Story.

The tug "Harry M. Wall," owned by the Independent Pier Company, had helped the Margaret in turning at her anchorage and was accompanying her up stream in order later to assist her in berthing. She was being navigated by a mate; her master, a licensed river pilot, had gone aboard the Margaret to act as her pilot, whether on his own responsibility or that of the Pier Company and whether for his own profit or that of the company are questions to be decided later.

The Margaret maintained a course in about the middle of the ship channel with the tug Wall, keeping pace, about 100 to 150 feet off her starboard quarter, that is, to the eastward. The Wall saw the Merchant about two points off her starboard bow standing well to the eastward (whether in the channel or beyond the channel is not clear) and heard the Margaret give a two blast passing signal. To this the Merchant gave an assenting signal by two blasts which the Wall not only heard but saw in the two puffs of steam.

Immediately on hearing the Merchant's signal assenting to a starboard to starboard passing with the Margaret, the Wall ported her wheel and, leaving the channel, sheered off to the eastward and ran in shallow water for about a quarter of a mile toward the Jersey shore in order "not to come in between the two ships when they passed on the starboard side of each other," as all rivermen consider it highly dangerous for a tug to be caught in the lane between passing ships. From this distant position she saw the Merchant head westward athwart the Margaret's bow, giving one short blast of her whistle. Then the ships collided.

### The Bering's Story.

The tug Bering was bound down stream with a tow. Not being able to state her exact position in the channel, she was on the western side or the eastern side according as the story of the Merchant or that of the Margaret is believed, but, as testified by all, the important fact is she was between the Merchant and the Pennsylvania shore and about 100 to 150 feet off the Merchant's starboard quarter. When the Margaret first saw the Bering she was ahead of the Merchant and when she first saw the Margaret the latter ship was coming up the bend bearing on the tug's starboard bow. In those relative positions of the two craft, the Bering signaled the Margaret by two blasts for a starboard to starboard passing and the Margaret made assenting answer by two blasts, which the Bering both heard and saw. At that time the Bering had not seen or heard anything of the Merchant. But immediately after she had signaled the Margaret the Bering saw the Merchant coming down from behind about 100 feet on her port side without giving an overtaking signal. The Bering was moving at three knots; the Merchant twice as fast. Neither before nor later did the Bering hear or see the Merchant signal the Margaret. After passing the Bering, the Merchant laid her course to starboard or westward and directly crossed the Bering's bow, shutting the Margaret out of her view altogether. This maneuver of the Merchant compelled the Bering immediately to reduce her speed and put her helm to port in an effort not to hit the Merchant's stern. The Bering then heard danger signals but, her view having been cut off, did not see the collision.

As the testimony of the witnesses aboard the several craft is wholly contradictory, we shall decide this case not on the conflicting testimony of the witnesses but on what the two ships and the two tugs did—the res gestæ of the occurrence. In this regard, fortunately, certain of their doings are clearly established and not disputed. We shall accept them as facts and on them rest our judgment.

When the ships sighted each other the Margaret, down stream and under or just above the Delaware River Bridge, was a little east of the center of the channel. On

this the two ships agree. Whether she stayed there or, bearing to port, moved to the western side of the channel is a sharp issue between the ships.

Whether the Merchant, up stream, was east of the channel, in the channel on its eastern side or on its western side, is another sharp issue between the ships.

Now the two ships were somewhere in these disputed zones.

Where was the Margaret? Laying aside the testimony of the witnesses aboard her and also the testimony of the witnesses aboard the Wall that she held her course in mid-channel, what did the Wall do? When she heard the ships exchange passing signals she immediately ran eastward out of the channel and out of the way. As to the signals exchanged, certainly this maneuver of the tug signifies that they were two-blast starboard to starboard signals. As to positions of the ships about to pass, the reasonable inference to be drawn from the maneuver is that if the ships had been in the western side of the channel the Wall, for safety, would not have run out of the channel into shallow water a quarter of a mile toward the Jersey shore. As the Wall, admittedly east of the Margaret and on the eastern side of the channel, ran out of the channel still farther to eastward it is a fair inference that the ships were east of the center channel line.

If perchance the Wall mistook the Bering's undisputed two blasts up stream for two blasts from the Merchant, then again, the Wall was justified in expecting a starboard to starboard passing and in running from it, for the Merchant, it is conceded by all, was to the port and therefore to the eastward of the Bering. A situation that called for a starboard to starboard passing between the Bering and Margaret called all the more for such a passing between the Margaret and Merchant.

Where was the Merchant? The Wall, by running away, has told us. But suppose the Wall made a mistake and therefore a useless and meaningless maneuver, we think the Bering by her action tells us where she was. The Bering did not know and therefore could not say how far she herself was from the Pennsylvania shore. There is nothing peculiar about that because her attention was centered on the critical situation in which she found herself with her tow when she saw the Margaret coming up ahead and the Merchant steaming up behind. The Merchant puts her own position about 300 to 360 feet from the Pennsylvania pierhead line when she passed the Bering. The Merchant herself put the Bering 100 to 150 feet off her starboard quarter and between her and the Pennsylvania shore. According to the Merchant therefore the Bering was only 150 to 200 feet from the docks. According to other testimony she was several hundred feet to the eastward. The position of the Bering may be judged from her action and the position of the Merchant from that of the Bering.

After overtaking the Bering it cannot be questioned that the Merchant cut across her port bow on a westward course. To do that the Merchant, after porting her helm, must have gone the distance between her first position and the Bering (100 to 150 feet) and brought herself to within 150 to 200 feet of the shore. For the Merchant thus to cut across the Bering's bow shoreward in that limited space would be almost criminal and therefore is highly improbable. The inference is she had more space, and more space means she was farther out in the channel, and the farther out she was the greater was the justification for a starboard to starboard passing. Moreover it is not disputed that when the Merchant crossed the Bering's bow she put the Bering in real trouble. The tug had just exchanged starboard to starboard passing signals with the oncoming Margaret, which, baring an exigency, she was bound to observe. In crossing her bow the Merchant cut off the tug's view of the Margaret altogether. Also she came so close to the tug that immediately there arose a danger that the tug's stem would hit the Merchant's stern. Manifestly the tug was in trouble and had a problem that called for immediate solution. The problem had three elements: One, to avoid hitting the Merchant's stern, another, to save her tow, and the third, either to observe or risk violating her outstanding passing signal with the Margaret. What was she to do? She could lower her speed but she could not stop because of her tow astern. To get out of this predicament what the Bering did was to port her helm and thus move to starboard and shoreward. This she did directly against her own starboard to starboard passing signal with the Margaret. If she had only 150 to 200 feet to do it in, the maneuver was highly hazardous and justified only by extreme necessity. The inference is that when she ported her helm and moved to starboard she had more water shoreward than the Merchant claims she had and more water means that she, and therefore the Merchant, was farther out in the stream. The exchange

of starboard to starboard passing signals between the Bering and the Margaret shows a situation which, as those two boats saw it, called for a starboard to starboard passing. If the situation between the Bering and Margaret required or justified such a passing, the situation between the Margaret and Merchant, the latter ship being 150 feet farther to the east than the Bering, called with greater reason for such a passing.

The only evidence from the acts of the four craft that would justify a port to port passing is that of the Merchant alone. Assuming the acts of each boat were prompted by good seamanship or inspired by the desire for self-preservation, and assuming, as we must, that at least one was gravely at fault, the maneuvers of the Wall and Bering—two boats without financial interest in what was about to happen—bespeak a situation in which a starboard to starboard passing was expected and the Margaret's signals as testified to and acted upon by the Wall and Bering showed that she concurred in their judgment. Accordingly we find as facts that the Margaret held a course near the center of the channel; that aside from any confusion or illusion arising from the bend in the river, the Merchant was well to the eastern side of the channel and therefore on the Margaret's starboard and in such relation to the Margaret as to justify a starboard to starboard passing.

Just here the Merchant for defense invokes the narrow channel rule (Article 25 of the Pilot Rules), the starboard hand rule (Articles 19, 21, 22 and 23 of the Pilot Rules) and the passing signals rule (18 of the Pilot Rules) and cites many cases in which these rules have been considered. We find that in some of the rules there are express exceptions and implicit in them are exceptions arising from unusual situations, and that, accordingly, neither the rules nor the cited cases unqualifiedly govern the extraordinary facts of this case.

If, however, we are all wrong about the Merchant's position in the channel and about how she approached the Margaret, and if we place her where she says she was and concede that she did what she says she did, still we think she was at fault. And for this reason: The Merchant though moving at half speed was making at least six knots. When a half mile apart, according to her story, she signaled the Margaret by one blast for a port to port passing. This the Margaret immediately refused. With signals crossed the Merchant did nothing except to keep right on at the same speed. A minute later, when a quarter of a mile apart, she repeated the signal for a port to port passing and again the Margaret refused to accept her signal. The Margaret's two refusals were signaled by double blasts indicating that she proposed and insisted upon a starboard to starboard passing. The Merchant however kept on still another "minute or so," driving ahead all the while against crossed signals and into a situation of obvious peril and did not alter her speed until she reversed her engines only a minute before the collision. These facts are taken from the Merchant's own testimony and we are satisfied they convict her of fault in persisting to force a port to port passing and in not slowing down when the danger first became apparent to her.

■ Nor was the Margaret blameless. She could see what was happening and what was about to happen just as well and just as far ahead as the Merchant. Accepting as true, for the moment, her contention that starboard to starboard passing signals had been exchanged between her and the Merchant, she saw the Merchant when, disregarding those signals, she began to lay a course across the Bering's bow which was across her bow also, yet she kept on and did not reduce speed or reverse engines until the situation was so bad as to call for danger signals, and that, as testified by witnesses aboard the Margaret and as recorded in her log, was only a minute before the collision. We doubt that the Margaret could, at a sustained speed, have maneuvered out of the peril, but we are satisfied that the situation was such as to prompt a cautious navigator to slow down before she did. Had she reversed her engines only a few seconds sooner and at that time made her maneuver to starboard she, doubtless, would not have hit the Merchant. As it was, she almost missed her. Though clearly the situation was not of her making, the duty rested on the Margaret to stop when she had opportunity to see and time to act. Finding that she had both and did not act with the promptness the situation demanded, we hold, on her own showing, that she too was at fault.

■ But the Margaret says, even so, she should not pay for it because she was piloted by the master of the tug Wall who was an employee of the Independent Pier Company, impleaded as a party to these suits, and any negligent navigation found against the Margaret was his and the responsibility for it was that of the Pier Company. This vigorously contested issue of fact we have considered with care and are convinced that

the learned trial judge committed no error in holding that the master of the Wall, when acting as pilot for the Margaret, was not acting for his employer within the scope of his employment but was acting independently and for himself.

While we hold the Margaret at fault in not promptly slowing down when the situation of danger became apparent, we also hold that, because of the major and primary fault of the Merchant in creating the situation, the Margaret was not equally at fault. Therefore appraising the concurrent fault of the two ships as fairly as we can, we direct that the decree allowing each ship to recover from the other one-half the damages sustained be modified by allowing the Margaret to recover three-fourths of her damages from the Merchant and the Merchant one-fourth of her damages from the Margaret, with the provision however that, because of a probable difference in damage sustained by the two ships, the Merchant shall not in any event recover from the Margaret a sum greater than that which the Margaret will be entitled to recover from the Merchant. When thus modified, together with a similar modification in respect to the libel of Sunkett, the decree will in all respects be affirmed; costs in both trial and appellate courts on the libels filed by the two. ships to be taxed one-fourth against the Margaret and three-fourths against the Merchant and costs on the libel filed by Sunkett to be taxed against the two ships in the same proportion.

### On Rehearing.

PER CURIAM. ■ In the aforegoing opinion this court directed that the decree of the trial court, holding each ship liable for one-half the damages of the other ship, be modified so as to allow the Margaret to recover three-fourths of her damages from the Merchant and the Merchant one-fourth of her damages from the Margaret. This direction was based on two definite findings of fact; one, that both ships through negligent navigation contributed to the collision; the other, that their contributions were markedly - different in degree. Thus there developed a situation of mutual faults to which it seemed that the rule of mutual liability should not, in view of the found inequality of fault, be applied; but rather that the damages should be apportioned to the negligence respectively attributable to the two ships, when, as here, it can be fairly ascertained. Therefore the court, in an endeavor to conform the decree to its fact findings and to do justice to the ship least offending, directed apportionment of the damages in the manner indicated. Experiencing a growing doubt, not as to its power to make the order apportioning damages, but as to its conduct in not literally and respectfully following the moiety rule which the Supreme Court has from time to time applied, this court, of its own motion, called for a rehearing on the sole question of division of damages.

At the rehearing all doubts were dispelled by the thorough research made and assistance rendered by proctors for the several parties on a showing that, a few cases in lower courts to the contrary, the rule of the Supreme Court has been not to appraise different degrees of blame when injuries have resulted from mutual though unequal faults and apportion the loss accordingly, but to regard liability as mutual and to apportion the loss equally between the offending ships on the principle that damage by a common fault is a common loss. Beginning with The Schooner Catharine v. Dickinson, 58 U. S. 170, 15 L. Ed. 233, the first case which raised the question before that court, and running through a long line of cases, 11 Corpus Juris, 1200, et seq., from which the following may be selected at random, The Atlas, 93 U. S. 302, 23 L. Ed. 863; The North Star, 106 U. S. 17, 1 S. Ct. 41, 27 L. Ed. 91; The Max Morris, 137 U. S. 1, 11 S. Ct. 29, 34 L. Ed. 586; The Eugene F. Moran, 212 U. S. 466, 29 S. Ct. 339, 53 L. Ed. 600; White Oak Transp. Co. v. Boston Cape Cod & New York Canal Co., 258 U. S. 341, 42 S. Ct. 338, 66 L. Ed. 649, this court, in its own research aided by the industry of proctors, has found no case in which the Supreme Court has departed, even by variation in exceptional circumstances, from its rule of equal liability for mutual faults and equal division of damages, adopted expressly as the best rule for distributing justice between mutual wrongdoers. The Max Morris, supra. Yielding to these authoritative pronouncements, this court, wholly aside from whatever views it may have on the subject, is constrained to follow the rule and in consequence change its decision to that of affirmance of the decree dividing the damages equally in the manner which the law prescribes. The North Star, supra.