## THE MARY IDA.

## THE MAGGIE BURKE.

*(District Court, S. D. Alabama.* June, 1884.)

1. ADMIRALTY—COLLISION—BURDEN OF PROOF.

   In an action growing out of a collision of vessels consequent upon a failure of one to respond agreeably with the signal of the other, as directed in the navigation laws, (Rev. St. 4405 and 4412,) the burden of proof is on the vessel that fails so to respond to explain the failure satisfactorily to the court.

2. SAME—PARTY COMPLAINING MUST HIMSELF KEEP WITHIN THE LAW.

   A vessel cannot evade *all* responsibility for damage given or received in a collision by showing that the other vessel did not respect her signal as the laws require, unless she further shows that she herself, in prudence, afterwards endeavored to avoid the peril imminent by checking her speed and backing water, as directed by the same laws.

3. SAME—APPORTIONMENT OF DAMAGES.

   In cross-suits growing out of a collision of vessels, there being proved fault on both sides, damages will be apportioned according to the disparity of fault.

In Admiralty.

*G. B. Clock* and *G. M. Duskin,* for libelants.

*I. L. & G. L. Smith,* for respondents.

BRUCE, J. These cases are, by agreement, heard together. On the night of the nineteenth day of January, 1884, between 10 and 11 o'clock, the Mary Ida, a steam tow-boat, with three barges in tow, J. W. McDowell master and pilot on watch, while descending the Mobile river at a point about a mile and a half below Chestang's bluff, collided with the steamer Maggie Burke, ascending the river on one of her regular trips, with freight and passengers, James D. Vick being the pilot on duty at the time. The result of the collision was the sinking of the steam-boat Mary Ida, in some 56 feet of water, with her freight on board at the time, consisting of a lot of cotton-seed and a small lot of hard wood.

The owners of the Mary Ida, Robinson & McMillan, bring this suit, and libel the steamer Maggie Burke, alleging and charging that the collision and the resulting loss of the boat Mary Ida and her freight was caused by the negligence, want of skill, recklessness, and improper conduct of the officers and persons in control of the Maggie Burke at the time, and that it was without fault on the part of the officers and crew of the Mary Ida.

The cross-libel of the owners of the Maggie Burke allege and charge that the collision and consequent loss of the Ida and freight resulted also in large damage to the Burke, and was brought about solely and exclusively by the fault, negligence, and unskillfulness of the officers and crew of the Mary Ida, particularly by the fault, negligence, and unskillfulness of her pilot, J. W. McDowell, and without any fault whatever on the part of the officers and crew of the Burke. These libels are both answered by the respective parties respondent, and the question for solution and decision, upon which a large mass of

testimony has been taken, is, who was at fault, if any one, and at whose door does the responsibility for this collision and consequent loss lie?

That the collision was brought about by the fault of one or both of the colliding vessels seems to be clear, for the portion of the river in which the collision occurred is, by the testimony, neither difficult or dangerous for navigation, and the testimony discloses no reason for the conclusion that this collision was the result of circumstances beyond the control of skillful and careful navigators. The night was neither dark nor stormy. Some of the witnesses testified it was a gray night, others say it was star-light, a little windy, and the wind from the north. Assuming, then, that the collision was brought about by the negligence or unskillfulness of the officers charged with the navigation of one or both of these vessels, we proceed now, from the law and the facts in proof in the case, to ascertain where the fault lay, and so fix the responsibility for the loss resulting from the collision.

In this inquiry, attention must be given to the rules and regulations for the government of pilots of steamers navigating the rivers flowing into the Gulf of Mexico and their tributaries, adopted by the board of supervising inspectors, under the authority of sections 4405 and 4412 of the Revised Statutes of the United States. The authority of these rules is not questioned, but the counsel for the respondents denominate these rules supplemental rules, and call attention to the rules established by acts of congress set forth in section 433, c. 5, of the Revised Statutes, which provides that "the following rules for preventing collisions on the water shall be followed in the navigation of vessels of the navy, and of the mercantile marine of the United States." An examination of these rules, however, shows that they are primarily for the government of sea-going vessels, and they are little applicable to steamers navigating rivers whose waters flow into the Gulf of Mexico.

The rules and regulations first mentioned above were adopted by the board of United States inspectors of steam-vessels June, 1871, amended January, 1875, February, 1880, and 1883, and approved March 10, 1883, by the secretary of the treasury, so that they were in force on the nineteenth day of January last, when this collision occurred, and were the paramount rules for the government of the pilots on these two colliding vessels.

Rule 1 provides: Where steamers are approaching each other from opposite directions, the signals for passing shall be one blast of the steam-whistle to pass to the right, and two blasts of the steam-whistle to pass to the left. The pilot on the ascending steamer shall be the first to indicate the side on which he desires to pass; but if the pilot on the descending steamer shall deem it dangerous to take the side indicated by the pilot of the ascending steamer, he shall at once indicate with his steam-whistle the side on which he desires to pass, and the pilot on the ascending steamer shall govern himself accord-

ingly, the descending steamer being deemed to have the right of way. But in no case shall pilots on steamers attempt to pass each other until there has been a thorough understanding as to the side each steamer shall take; the signals for passing must be made, answered, and understood before the steamers have arrived at a distance of 800 yards of each other.

The Ida, the descending steamer, J. W. McDowell pilot on duty at the time, when at a point below Chestang's bluff, saw the Burke ascending the river, and blew two blasts of her whistle, indicating her purpose to pass to the left, that is, on the east side of the river. The steamer Burke responded, but whether promptly, as was her duty, or not, is a point on which there is much conflict of testimony, and her response was one whistle, which indicated that she did not accept the signal of the Ida for the east side of the river. The Ida blew two whistles again, and the Burke again responded with one whistle, and in a very short time the vessels collided, with the result before stated.

Between Seymour's bluff and Chestang's bluff the distance is about three miles, and in which distance there are two bends of the river, and at a point on the west bank, nearly opposite the point of collision, there is a point covered with trees extending a short distance out into the river, but not far enough to change the current in the river, and is for that reason called by river men a false point. The Burke came up the river in the usual place where it is navigated by ascending steamers, and below that point hugging the west shore, and was, consequently, under the false point, which obstructed the view, and this was doubtless the reason why the boats approached so near to each other before signals were exchanged as soon as required by the rule cited heretofore. The Burke, however, did not accept the signal of the Ida, but blew a cross-whistle, and thus refusing to govern herself according to the signal of the Ida, the burden is on her to show good reason for her failure or refusal to comply with the terms of the rule. The reason given is that she was crossing from the point on the west bank of the river to the point on the east bank, and thus was complying with a rule and custom in the navigation of the river; that is, that ascending boats run the points to evade as much as possible the force of the current, while descending boats follow the current in the middle of the river around the bends; that after she, the Burke, had started on her crossing she could not change her course and pass the Ida on the west side of the river, and that an effort to have done so would have increased the danger and hazard of a collision; that the Ida was approaching her in such position in the river that an effort on her part to change her course and pass on the west side of the river would have resulted in the Ida striking her on the starboard side; whereas, if, when the boats were approaching each other end on, each had ported her helm, as required by rule 16, § 4233, of the Revised Statutes, the Ida would have passed under the stern of the Burke, on the west side of her, and a collision been avoided.

This defense rests upon the fact, if it be a fact, that at the first signal of the Ida the steamers were so close together and the danger so imminent that the officers of the Burke cannot be held to a strict compliance with the rule.

It is therefore important to inquire how near the steamers were when the Ida blew her first two whistles for the east side of the river, where she was in the river when she blew, and where the Burke was in the river at that time; and upon these two points there is much discrepancy and uncertainty in the testimony. The testimony as to where the Ida was when she blew her first signal is by some of the witnesses that she was well up to the east bank, others the middle of the river, and others that she was on the west side of the river, out in the cove or bend of the river. The weight of the evidence is, and I so find the fact to be, that she was between the center and eastern bank of the river when she signalled the Burke, at considerable distance above the point of collision, to estimate which would be very difficult. At this time, that is, at the first signal of the Ida, where was the Burke? Capt. Finnegan testifies that he was on deck at the time. He thinks the Burke was at the time pretty well on the crossing, and the steamers were 150 to 200 yards apart, but he says it was a very hard thing to estimate. James D. Vick, pilot at the time, says: "I had just started on my crossing; did not see the Ida when she first blew, on account of the smoke, but saw her very soon." And he does not make a very clear statement of the matter, but estimates the distance at from 150 to 200 yards. Benham, the mate on the Burke, says: "When I heard the signal of the Ida, the Burke was coming around the port point, western shore; was quite up to make the crossing from the west to the east shore; was on the crossing; and had gone the length of the boat out from the shore; that by the time the Ida blew her second two whistles the Burke was in the middle of the river." McDowell testifies that he blew his first two whistles when he saw the smoke of the Burke above the trees on the point below him; that the Burke was then eight or nine hundred yards from him. And he is sustained by the witness Dan Williams, who was on board the Ida; heard the whistle of the Ida; went into the pilot-house some seconds afterwards, and estimates the distance between the boats, after he arrived in the pilot-house, at 450 yards. McDowell testifies that it was from one-half to one minute before the Burke responded to his signal, and he is sustained in that by Williams and other witnesses, though Capt. Finnegan and others testify the response of the Burke was given immediately.

It is difficult to say from the testimony how far the boats were apart at the first signal of the Ida; but the river at the point of collision—which is its narrowest point in that vicinity—is 528 feet wide, and the Ida, coming down from above, between the middle and east bank of the river, and the Burke ascending and commencing her crossing, they must have been considerable distance apart; and the estimate of 150

to 450 feet is much more likely to have been the distance between the boats at the second two blasts of the Ida than at the first; and an error of this kind, under the circumstances, is no reflection upon the truthfulness of the witnesses. This distance being difficult of determination, the testimony of the witnesses called as experts in the navigation of the river could not, in the nature of things, be very definite for the conduct of the officers of both boats, particularly that of the Burke, depended largely upon the distance she was from the descending boat when she first became aware of her presence. If the Burke had entered upon or was upon her crossing at the first signal of the Ida, and could not with safety have changed her course and passed on the west side of the Ida, still, what is there in the face of the signals of the Ida to justify the Burke in cross-whistles and persistence in her course? Why did she not stop and back her engines? She was the ascending steamer, and could more readily check her speed than the steamer descending with the current. This would seem to be the dictate of common prudence, and, if she could not accept the signals of the Ida, then the rule No. 2 prescribed the means that shall be used to avoid collisions. It provides:

"If, for any cause, the signals for passing are not made at the proper time, as provided in rule 1, or should the signals be given and not properly understood, from any cause whatever, and either boat become imperiled thereby, the pilot on either steamer may be the first to sound the alarm or danger signal, * * * when the engines of both steamers must be stopped and backed until their headway has been fully checked."·

The point of the collision was well up to the eastern bank of the river; some of the witnesses say within 20 feet of it. The bow of the Burke struck the Ida on the starboard side, forward of the wheelhouse, at an angle between the bows of the boats of less than a right angle, and the Ida swung around on the left of the Burke, her tows behind her making a ·circle in the river, and in a few minutes the Ida, probably by the force of her tows, passed to the rear of the Burke out into the river for a short distance and sunk. So that the boats must have come together with considerable force in order to have produced such a result, and the bow of the Burke was seriously damaged by the collision; and it is perhaps saying no more than the evidence shows that the Burke, with her freight and passengers, was saved from more serious disaster by the vigorous and skillful conduct of her officers.

Conceding that at the second two blasts of the Ida it was then too late for the Burke to change her course and go to the westward of the Ida, without imminent danger of exposing her starboard side to the Ida in such manner as to endanger her and the lives of her passengers on board, still the question remains, why did she not stop and back instead of persisting in her course? The witness Walker, engineer on the Burke, on duty at the time, when asked what his engines were doing at the time of the collision, says: "I *think* they were

backing." And in reply to the direct question, "Was the Burke backing at the time?" he says: "I gave her steam before she struck; I *suppose* she was backing." The most that can be said of this is that her engines had commenced backing at the instant or just before the collision.

My conclusion on this point is that although at the first signal of the Ida the Burke rang a slow bell, that at the time of the collision her heading had not been fully checked, and that she did not comply with rule No. 2 in that behalf.

There is a great deal of testimony to show that the Burke, just before and at the time of the collision, was just where she ought to have been by the customary course of navigation of the river at that point; that she was making her crossing in the usual place and in the usual manner; and the conclusion seems to be deduced from that that she was therefore not at fault. This conclusion, however, rests upon the assumption that the appearance of the descending steamer Ida, and her signal to pass on the left side of the river, made no change in the navigation of the Burke necessary. This view of the subject, however, is in conflict with a just and fair application of rules Nos. 1 and 2, *supra*, and I find that on the occasion in question the Burke violated both of those rules, and that such violation of the rules was the proximate and immediate cause of the collision.

A question, however, remains, which is, whether the fault of the Burke was the sole cause of the collision, or whether the Ida was also at fault? There are many points made against the Ida. It is said she was towing barges in her rear, and in a manner that the custom and usage of the navigation of the river forbid; that it interfered with her ability to back in the face of danger, and therefore she was at fault. It is claimed that she should have laid up at night, especially when her officers knew that on Saturday, as that was, she would meet the regular packets ascending the river. It is also claimed that she was not properly manned; that one and the same person was acting as master and pilot at the same time; but these points are not well taken, and I do not stop to discuss them.

It is claimed that the pilot of the Ida was at fault because he did not pursue the usual course in coming down the river; that is, following the current and pass close under the false point, and that had he done so a collision would have been avoided. True it is, he must be held to have known the river and the mode of navigating it. And it may be conceded that he had no right, doggedly, as the counsel say, to insist upon his right of way and insist upon the rule when it would have been the part of good judgment to waive it, still the rule was on his side, and the Burke seems to have insisted upon her usual course in violation of the rule, and in defiance of the signal of the Ida. Rule No. 2, *supra,* was as much binding upon the Ida as upon the Burke, and McDowell says he did not stop her engines until after the second cross-blow of the Burke. The Ida was coming down the river, and

the current added to her speed, and though she had a right to assume that the Burke would accept her signal, yet when that was not done, and a misunderstanding arose, the dictate of prudence, as well as the terms of the rule, required that every effort should be made to stop the headway of his boat.

In connection with this point may be considered the failure of the Ida to answer the cautionary whistle of the Burke, which she blew just after she passed the steamer Alabama, which had stopped at Seymour's bluff. McDowell says he heard the whistle when he was in the reach above Chestang's bluff, but he says he did not respond because he thought if he did the ascending boat would take his signal as indicating a purpose on his part to pass on the west side of the river, when his purpose was to pass on the east or left side of the river. The boats must have been some three miles apart at that time, and the reason given scarcely seems satisfactory. It may not be clear that the failure of McDowell to respond to the cautionary whistle of the Burke contributed in a direct way to the collision, but he was thereby advised of the approach of the ascending steamer, and aware also of the usual manner in which the river was navigated at that point, and should therefore have sooner stopped the headway of his boat, especially after he found his signal was not accepted by the Burke.

I find, however, that there was a great disparity of fault, and that the burden of it lies with the Burke, as we have already seen, and the loss is apportioned in the ratio of one-fourth against the Ida and three-fourths against the Burke.

The decree is therefore for the libelants, Robinson & McMillan, against the Burke, her tackle, etc., for the sum of $7,023.95, and the costs in both cases are divided in the same proportion.