**N. M. PATERSON & SONS, LIMITED, a corporation, Libelant,**

v.

**CITY OF CHICAGO, a Municipal corporation, Respondent-Petitioner,**

v.

**The GREAT LAKES TOWING COMPANY, Inc., a corporation, as owner of the TUG OREGON, Impleaded Respondent.**

**No. 58 C 1860.**

United States District Court
N. D. Illinois, E. D.

May 21, 1962.

Memorandum Opinion and Supplementary Judgment Order
Sept. 25, 1962.

Final Judgment Order Sept. 26, 1962.

See also 176 F.Supp. 323.

Stuart B. Bradley, Bradley, Pipin, Vetter & Eaton, Chicago, Ill., for plaintiff.

Robert G. Mackey, Asst. Corp. Counsel, City of Chicago, Chicago, Ill., for defendant City of Chicago.

Harney B. Stover, Stover & Stover, Milwaukee, Wis., John T. Kelly, Murphy, Pearson & O'Connor, Chicago, Ill., for defendant Great Lakes Towing Co.

MINER, District Judge.

This matter having been fully tried before the Court, and the court having read the pleadings filed herein by the respective parties, and the court having heard and examined all the testimony, documents and exhibits presented by the respective parties and admitted into evi-

dence, and the court having read, heard and considered the briefs, memoranda and oral arguments submitted by counsel in support of their respective positions, and the court being fully advised, the court hereby enters its Findings of Fact and Conclusions of Law as follows:

## FINDINGS OF FACT

1. This is a libel filed by N. M. Paterson and Sons, Ltd. for damage to the steamship Torondoc of $13,000, and a cross-libel by respondent City of Chicago against libellant for damage to the Dearborn Street Bridge of $10,569.35.

2. The libelant, N. M. Paterson & Sons, Ltd., a corporation duly organized under the laws of the Dominion of Canada, was at all times material hereto, the sole owner and operator of the Steamship Torondoc.

3. The respondent, City of Chicago, a municipal corporation duly organized under the laws of the State of Illinois, was at all times material hereto, the sole owner and operator of the Dearborn Street Bridge, a highway bridge lying within the territory of said municipality and spanning the Chicago River.

4. The impleaded respondent, The Great Lakes Towing Company, a corporation duly organized under the laws of the State of New Jersey, was at all times material hereto, the sole owner and operator of the diesel tug Oregon, engaged in harbor towing at the Port of Chicago, Illinois.

5. The Chicago River is a tributary to Lake Michigan and is a part of the navigable waters of the United States.

6. The Dearborn Street Bridge was erected by respondent, City of Chicago, pursuant to the terms of a permit of the Secretary of War of the United States, issued in 1905. The structure was completed in 1907, and rewired in 1939 at which time the conduits were also replaced. On November 20, 1957, the structure was a double leaf bascule-type bridge operated by employees of the City of Chicago.

7. At approximately midnight of November 19–20, 1957, the Torondoc, which had been lying at the wharf at Time Incorporated, above the Halsted Street Bridge in the south branch of the Chicago River, commenced a trip down the river assisted by the tug Oregon on a bow line. The steamer, being partly loaded, proceeded north in the south branch of the Chicago river, turned east at the bend before reaching the Franklin-Orleans Bridge, and proceeded easterly through a series of bridges. Its destination was the North Pier Terminal immediately west of the Outer Drive Bridge over the Chicago river.

8. In the course of its trip down the river, the steamship Torondoc, assisted by the tug Oregon, passed through four bascule-type bridges which opened to allow such passage without incident. These were the Franklin-Orleans Street, Wells Street, La Salle Street and Clark Street Bridges.

9. At the time of the incident giving rise to this suit, there were in effect certain regulations as follows: (a) by the Coast Guard under authority of 33 U.S.C.A. § 241 relating to navagation of the Great Lakes and waters tributary thereto; (b) by the Secretary of the Army under authority of 33 U.S.C.A. § 499 relating to the operation of drawbridges over navigable waters and the passage of vessels under such drawbridges; and (c) ordinances promulgated by the City of Chicago regulating drawbridges within its jurisdiction and the passage of vessels through waters within its jurisdiction. For convenience, many of these regulations have been compiled in a handbook entitled "Great Lakes Pilot," a copy of which was available to the Master of the steamship Torondoc in the course of the trip in question. The Master of said ship was familiar with all regulations and ordinances governing the navigation of his ship at the time in question.

10. Among the regulations promulgated by the Secretary of the Army under 33 U.S.C.A. § 499, is the following,

relating to the passage of vessels under drawbridges (33 C.F.R. p. 287:

"Every owner, officer, or person in charge of any vessel, craft or float * * * shall sound or cause to be sounded a whistle to signal bridge tenders to open and swing bridges, and such signal shall be three sharp, short sounds of the whistle, to be given in succession as quickly as possible * * *."

11. In the course of its passage under each of the four bridges mentioned in Finding 8 above, the Torondoc made no whistle sound.

12. The Dearborn Street Bridge of respondent, City of Chicago, is the first bridge immediately east of and approximately 400 feet from the Clark Street Bridge.

13. The tenders of the Dearborn Street Bridge had been notified by telephone message that the Torondoc was approaching from the west before the Torondoc had rounded the bend above the Franklin-Orleans Street Bridge.

14. The Coast Guard regulations promulgated under the authority of 33 U.S.C.A. § 241 provide in part (33 C.F.R. p. 104):

"(a) Lift span lights. Each lift span of every bascule bridge shall be lighted so that the free end of the span will be marked on each side by a green light which shows only when the span is fully open for the passage of a vessel and by a red light which shows for all other positions of the lift span."

15. The Dearborn Street Bridge was equipped with such lift span lights marking the free end of each span. Each span of the Dearborn Street Bridge was equipped with these lights on both east and west sides, so that they could be seen by ships proceeding either east or west in the Chicago river. These lights were in operation on the night of November 19–20, 1957, and were red when the Torondoc passed through the Clark Street Bridge going east.

16. As the Torondoc passed through the Clark Street Bridge, the Dearborn Street vehicular and pedestrian trafficgates were lowered preliminary to the opening of the Dearborn Street Bridge. This, as well as the flashing lights warning automobile traffic to cease crossing the Dearborn Street Bridge, was seen by the officers of the approaching vessels.

17. As the bow of the Torondoc passed through the Clark Street Bridge, the leaves of the Dearborn Street Bridge commenced to rise. The south leaf rose approximately eight feet and by reason of malfunction lowered down approximately four feet; the north leaf rose about two-thirds upward toward the open position and was then intentionally lowered to a position approximately ten feet above the partly open south leaf. The lift span lights on the bridge remained red during all pertinent times.

18. When the malfunction of the Dearborn Street Bridge became apparent, the tug Oregon gave a danger signal consisting of five short whistle blasts. The steamship Torondoc then put her engines full speed astern in an attempt to reduce her forward motion. The tug passed under the partly opened north leaf of the bridge. The deck of the steamship Torondoc on the port side also passed under the north leaf, but the pilot house, which extends upward from the deck, struck the north leaf of the bridge. The deck of the Torondoc on the starboard side struck the outer end of the south leaf of the bridge.

19. At and prior to the collision, the steamship Torondoc furnished and controlled her headway or speed without assistance from the tug Oregon. The assistance furnished by the tug Oregon consisted solely of occasional steering of the bow of the Torondoc. The Torondoc worked her engines and used her helm without signals from the tug Oregon. In moving east in the Chicago river, including the area between the Clark Street bridge and the Dearborn Street Bridge, the steamship Torondoc controlled her own rate of speed.

20. When it became apparent to the navigator of the tug Oregon that the Dearborn Street Bridge would not open for passage, there was no way in which the tug Oregon could have assisted in slowing or stopping the headway of the steamship Torondoc before contact was made by it with the leaves of the bridge.

21. The collision of the steamship Torondoc and the Dearborn Street Bridge occurred at approximately 1:00 A.M., Central Standard Time, on November 20, 1957.

22. At the time of and prior to the collision, the master and a wheelsman were in the pilot house of the steamship Torondoc, the second mate was forward on the bow, and the third engineer was in charge of the engine room. The master of the Torondoc, who had been in command slightly longer than one month, was making his second voyage down the Chicago river as a master of a ship. The Torondoc was his first command.

23. The Municipal Code of the City of Chicago (§ 38–30) provides, with respect to vessels passing under drawbridges, that:

"(a) Every vessel using steam * * * shall be moved slowly at a speed not exceeding four miles per hour under a low head of steam * * *."

"(b) Vessels exceeding two hundred tons navigating the harbor shall not proceed at a speed greater than four miles per hour."

24. The Torondoc was a vessel using steam, and also exceeded two hundred tons net tonnage.

25. Up to and including the time when the Torondoc passed through the Clark Street Bridge, it was traveling at a rate of speed in excess of six miles per hour.

26. The officers of the Torondoc were aware of the malfunction of the Dearborn Street Bridge in ample time to allow them to stop had the ship been moving at or under the maximum permissible speed of four miles per hour.

27. The malfunction of the south leaf of the Dearborn Street Bridge was caused by a defective resistor-grid in the electrical wiring system that activates the motors, as well as other failures in the electrical system. The admittedly defective grid was not preserved by the respondent City of Chicago.

28. Some of the factors which might have contributed to the malfunctioning of the grid and entire electrical mechanism are accumulation of dirt, moisture, age of grid insulation, continued vibration, and movement of the bridge controller's switch too rapidly, which latter factor could cause a sudden electrical overload.

29. Some of the parts of the electrical mechanism, including some of the resistor-grids, had been in use many years without renewal or testing by the respondent City of Chicago.

30. There are relatively simple and inexpensive methods of testing such equipment.

31. The regulations of the Secretary of the Army promulgated under 33 U.S.C. A. § 499, applicable to navigation through the Chicago river bridges, provide in part:

"(c) (2) If from any cause the bridge tender cannot open the bridge, he shall immediately notify the vessel by waving a red flag by day and a red lantern by night and continue waving the same until the vessel has stopped, continuing to display the same until the bridge can be opened."

32. The agents and servants of respondent City of Chicago in charge of the Dearborn Street Bridge did not give warning to the steamhip Torondoc by waving a red lantern or any other affirmative action.

33. At the time of the collision of the steamship Torondoc with the Dearborn Street Bridge, it was the policy of the respondent City of Chicagos' bridge department, upon failure of one leaf of a double-leaf bridge to open, to withhold raising the other leaf. This policy was aimed at preventing ships from attempting to navigate through a partly open bridge, as well as to eliminate the temp-

tation of automobile traffic to venture out onto a partly open bridge.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties to and the subject matter of this suit.

2. The regulations set forth in the findings of fact herein have the force of law.

3. The steamhip Torondoc was negligent, among others, in the following particulars:

(a) In traveling east in the Chicago river at a speed substantially in excess of the maximum speed allowed under the governing regulations set forth in Finding of Fact No. 23.

(b) In failing to sound its whistle upon approaching each of the bridges west of the Dearborn Street Bridge, in violation of the governing regulations set forth in Finding of Fact No. 10, and thus failing to timely warn the Dearborn Street bridge-tenders of its rapid approach.

(c) In entrusting command to an inexperienced master in a crowded area of river in which the ship would pass through a chain of bridges, closely spaced, each of which must open independently of the others.

(d) In failing to stop before contact was made with the Dearborn Street Bridge after those in command of the ship became aware of the malfunction of the Dearborn Street Bridge when the ship could have stopped, had it been traveling at or under the maximum permissible rate of speed.

(e) In proceeding under the assumption that the south leaf of the Dearborn Street Bridge would be opened fully, allowing the ship to proceed through one-half of the normal open span.

4. The negligence of the steamship Torondoc was one of the proximate causes of the collision between it and the Dearborn Street Bridge.

5. The negligence of the steamship Torondoc contributed to the collision to the extent of two-thirds (⅔) of the total fault.

6. The respondent City of Chicago was negligent, among others, in the following particulars:

(a) In failing to cause to open the Dearborn Street Bridge to allow passage of the steamship Torondoc.

(b) In failing to make adequate tests of the electrical mechanism of the Dearborn Street Bridge, which tests were relatively simple in nature and could have disclosed defects in the system similar to those which caused the malfunction.

(c) In permitting to exist, without such testing and any necessary replacement, a substantial number of extremely old components as part of the Dearborn Street Bridge, one or more of which caused the aforesaid malfunction of the bridge.

(d) In failing to give affirmative warning through its employees in charge of the Dearborn Street Bridge, of the malfunction of said bridge, to the steamship Torondoc by waving a red lantern, in violation of the governing regulations set forth in Finding of Fact No. 31. The mere existence of the stationary red lights on the bridge, marking the span, and turning to green when the bridge is fully open, did not discharge the duty to give affirmative warning by waving a red lantern.

7. The respondent, City of Chicago, has failed to make satisfactory explanation of the cause of the failure of the north leaf of the Dearborn Street Bridge to operate so as to absolve itself of negligence in regard to the malfunction.

8. The negligence of the City of Chicago was one of the proximate causes of the collision between the steamship Torondoc and the Dearborn Street Bridge.

9. The negligence of the City of Chicago contributed to the collision to the extent of one-third (⅓) of the total fault.

10. There was no fault in the navigation or operation of the tug Oregon contributing to the collision.

11. Respondent, City of Chicago, is not entitled to recover of the impleaded

582

respondent, The Great Lakes Towing Company, which operated the tug Oregon, for any damage caused to the Dearborn Street Bridge.

12. This is a case in Admiralty, wherein the doctrine of Comparative Negligence applies, and recovery may be apportioned based upon the degree of fault of each party.

13. The parties have made no proof of damages actually sustained.

14. In cases where separate damages arising out of a single occurrence are sustained and claimed by opposing parties, and where the damages to be awarded must be computed by comparing respective degrees of fault of the opposing parties, the formula to be applied in the determination of the respective amounts actually to be paid, by set-off or otherwise, is as follows:

(a) The percentage by which each party's wrongdoing contributed to the occurrence, is determined.

(b) The damages of the respective parties are added together and a total damage sum determined.

(c) The percentages determined in accordance with (a) are applied to the total damage figure determined pursuant to (b).

(d) In the event that the actual damage amount allocated to the fault of a party exceeds the amount of damages determined by the court or jury to have been sustained by that same party, the excess over the said actual damages sustained by him, is the amount of damages to which the other party is entitled.

(e) In the event that the actual damage amount allocated to the fault of a party is less than the amount of damages determined by the court or jury to have been sustained by that same party, the difference is the amount of damages to which that same party is entitled from the other party.

(f) In the event that the actual damage amount allocated to the fault of a party is equal to the amount of damages determined by the court or jury to have been sustained by that same party, no damages shall be allowed to or from that party.

15. After hearing on proof of damages actually sustained by the respective parties herein, the damages shall be apportioned as follows:

(a) The total amount of damages sustained to both the Dearborn Street Bridge and the steamship Torondoc shall be added together;

(b) Libelant N. M. Peterson & Sons, Ltd. shall be responsible for two-thirds ($\frac{2}{3}$) of the said total amount;

(c) Respondent, City of Chicago, shall be responsible for one-third ($\frac{1}{3}$) of the said total amount;

(d) The damages to be awarded to or from the respective parties shall be computed in accordance with Conclusion of Law No. 14.

16. Hearing on the matter of proof of damages shall be set for May 31, 1962.

## MEMORANDUM OPINION

This is a libel in Admiralty commenced by N. M. Paterson & Sons, Limited, owners of the steamship TORONDOC, to recover for damage to the ship occasioned by a collision between it and the Dearborn Street Bridge, a highway bridge owned and operated by respondent, City of Chicago, spanning the Chicago River. Respondent cross-libelled against libelant for damage to the bridge arising out of the same collision and also impleaded the Great Lakes Towing Company, owner of the tug OREGON, which was towing the TORONDOC at the time of the collision.[1] In their pleadings, and in the course of the trial had before this Court, both libelant and respondent attempted to charge the sole cause of the collision to the negligence of the other. No evidence was introduced which could be construed as connecting the collision with the negligence, if any, of the tug, and this Court so indicated at the close of the trial.

1. A complete statement of facts is to be found in the Findings of Fact and Conclusions of Law entered by this Court on May 21, 1962.

In Findings of Fact, Conclusions of Law and Judgment Order entered by this Court on May 21, 1962, the cross-libel against the impleaded tug owners was dismissed. This Court, after attributing two-thirds of the negligence and cause for the collision to the "Torondoc" and one-third to the City, held that the total damage to the "Torondoc" and the Dearborn Street bridge should be added together and apportioned between libelant and respondent by a formula based upon the comparative degrees of fault of each party. Thus libelant was held responsible for two-thirds of the total damage, and the City for one-third of the total damage.

■■ Subsequent to the entry of the Findings of Fact, Conclusions of Law and Judgment Order, libelant and respondent appeared before this court to move the amendment of said Findings of Fact and Conclusions of Law and to vacate the Judgment Order. Each urged various amendments which would have resulted in the imposition of complete liability on the other, which amendments this court has rejected in their entirety. Both joined, however, in suggesting that this court is bound, under settled decisions of maritime law, to divide damages equally in a case of collision arising from mutual fault, regardless of the fact that one party is found to be more at fault than the other, at least in the absence of facts authorizing application of the so-called "major-minor fault" rule.[2] Assuming, without deciding, that the "major-minor fault" rule has validity in some instances, this case does not present a situation wherein that rule can properly be invoked. The fault of the respondent City of Chicago, although of lesser degree than that of the "Torondoc", is far too substantial, both in its nature and in its contribution to the collision, to be excused or ignored. Furthermore, the court remains of the opinion that it is not bound to divide damages equally in a case where it has found a collision caused by the fault of both parties to have been attributable in greater degree to the delict of one than to that of the other, and where the court is able to determine and has determined the specific proportions which the faults of both bear to the occurrence and the total damage.

II.

In The Catharine, 58 U.S. (17 How.) 170, 15 L.Ed. 233 (1854) the United States Supreme Court discussed for the first time the equal-division principle. While the case has been cited as the first authoritative holding that the principle must be applied to all jointly-caused collisions,[3] examination discloses that the court did no more than approve its use in situations where both vessels are held to have been at fault without any determination of the respective degrees of fault. The schooner "San Louis" had collided with the "Catharine" and libelled the latter for its damage. The "Catharine" filed no cross-libel. The district and circuit courts had found the "Catharine" to be solely at fault, but upon an independent examination of the facts, the Supreme Court reversed, holding

2. The "major-minor fault" rule, usually expressed in terms of an exception to the alleged "rule" of equal division of damages in cases of mutually-caused collision, allows the court to impose the total amount of damages upon the ship more at fault, either by excusing a recognized fault of the minor offender, or by resolving all factual doubts in favor of the minor offender, once the court has determined that it is, in fact, a minor offender. The Great Republic, 90 U.S. (23 Wall.) 20, 23 L.Ed. 55 (1874) ; The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84 (1893) ; The Victory, 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519 (1897) ; Griffin, The American Law of Collision § 245 (1949) ; Staring, Contribution and Division of Damages in Admiralty and Maritime Cases, 45 Cal.L.Rev. 304 (1957). By this method the court could thus excuse completely a fault which it felt to be "minor" and impose full liability upon an offender who obviously is not fully to blame, a result which certainly poses an alternative with possibilities as harsh as that which divides damages equally where the respective faults are other than equal.

3. Griffin, The American Law of Collision § 245 (1949) ; The North Star, 106 U.S. 16 Otto 17, 1 S.Ct. 41, 27 L.Ed. 91 (1882).

both vessels at fault. Significantly, the court did not determine whether either vessel was more at fault than the other nor, of course, did it take the next step and determine the respective degrees of fault. The court merely determined that there was mutual fault. In remanding to the circuit court and in approving application of the equal-division principle to the facts before it, the court stated:

"The question [of division of damages where both vessels are at fault] we believe has never until now come distinctly before this Court for decision. The rule that prevails in the district and circuit courts, we understand, has been to divide the loss. * * * This seems now to be the well-settled rule in the English Admiralty. * * * *Under the circumstances usually attending these disaters, we think the rule dividing the loss the most just and equitable* and as best tending to induce care and vigilance on both sides, in the navigation." (58 U. S. at p. 177; emphasis added)

Indeed the quoted language seems to give express license to apply some other principle of division, where the circumstances are other than those "usually" attending such disasters. In the context of the opinion, one could hardly conceive circumstances other than "usual" to be anything but a case where disparity exists in the degrees of fault and the court is able to determine such respective degrees.

In The Atlas, 93 U.S. (3 Otto) 302, 23 L.Ed. 863 (1876), libelant was an insurance company which had insured certain cargo on a barge being towed by the steam-tug "Kate". The tug and tow were struck by the "Atlas", causing total destruction of the cargo, and the insurer libelled the "Atlas" for the loss. The district court found the damage to be caused by the mutual fault of the "Kate" and "Atlas" and, since the "Kate" had not been made a party, awarded libelant only one-half of its total damage against the "Atlas". The circuit court affirmed. Again, neither court made any finding more specific than that the collision had been caused by "mutual" fault.

On appeal, the Supreme Court concerned itself only with the injustice created by the fact that libelant, an innocent party, had been allowed to recover but one-half of its damage from the "Atlas" because the "Kate" had not been made a party. The court held that libelant could recover its entire damage from the "Atlas", which would presumably then have a right of contribution from the "Kate".

To be sure, the court in the midst of lengthy *dictum*, wherein were discussed some general Admiralty principles, stated that in cases of collisions caused by the fault of both ships, the damages must be divided equally between the parties, notwithstanding disparity of fault. But the court was not faced with a situation where a finding of disparity had been made. It merely presented its interpretation of the prevailing English practice, tracing the progress of a then recent English House of Lords case [4] which had reversed a proportional damage division holding of the Scottish Court of Sessions, and citing two others for the proposition of mandatory equal division.[5]

Insofar as the Supreme Court in The Atlas relies upon these particular three English cases as requiring equal division in cases of clear unequal fault and as suggesting that any inquiry into degrees of blame is irrelevant once "mutual" fault has been found, the court apparently misconstrued their import. This is not to say that there may not have been such a rule in fact existing in England at that time. It is merely to suggest that it is difficult to glean such an all-

---

4. Hay v. Le Neve, 2 Shaw H. of L.Cas. 395.

5. Vaux v. Sheffer [1852], 8 Moore P.C.C. 87, 14 Eng. Reprint 30; The Linda [1857], 4 Jur.N.S. 147, 166 Eng. Reprint 1149.

encompassing principle from the particular cases cited by the court.

In Hay v. Le Neve [1824], 2 Shaw H. of L. 395, 400, the owners of the ship "Wells" had instituted suit against the owners of the ship "Sprightly" for damages caused by the destruction of the former resulting from a collision between the two ships. The lower court (Judge-Admiral) had found the "Sprightly" liable to the full extent of the value of the "Wells", but on removal to the Court of Session of Scotland the result was modified. That Court, finding fault imputable to both vessels, found further that the greater blame rested with the "Sprightly" and held its owners liable for two-thirds of the damage to the "Wells". On appeal to the House of Lords, this result was modified to one wherein the loss was equally divided between the two wrongdoing vessels. The reason is not precisely clear, but appears to be the difficulty of determining, not generally, but in that particular case, the specific degrees of blame. After quoting what he alleged was *dictum* by one Lord Stowell to the effect that when both ships are to blame, the loss must be *apportioned* between them, and noting an apparently unreported 1789 case where damages had been equally divided, though the fault was in fact unequal, Lord Gifford, speaking to and ultimately for the Lords, noted:

> " * * * I have less difficulty in asking your Lordships to come to decision of equally apportioning the loss in this case [an obvious reference to the paucity of actual equal-division holdings], for your Lordships must have seen, I think, that it would be extremely difficult *in this case* to balance the degree of negligence in the one and the other. *I think they were, perhaps, equally culpable.*" (2 Shaw H. of L. at 404; emphasis added)

Lord Gifford had earlier mentioned the presence of a strong wind on the night of the accident, the increased navigational hazards caused by the wind serving to make any clear proportional division of fault between the ships extremely difficult. This case cannot be cited as authority for equal division in all cases; indeed it is questionable whether its reasoning can validly be extended to any but cases wherein degrees of fault are impossible to ascertain.

In Vaux v. Sheffer [1852], 8 Moore P. C.C. 87, 14 Eng. Reprint 30, the High Court of Admiralty, a court below the House of Lords in authority, reversed a lower court finding that only one ship was to blame for a collision. In finding both ships at fault, without any mention of degrees, it divided damages equally in accordance with the "rule" applied when both parties are culpable. It neither expressed nor implied an intention to prohibit a different result when unequal degrees of fault could be ascertained.

Finally, in The Linda [1857], 4 Jur. N.S. 147, 166 Eng. Reprint 1149, the last English case referred to by the court in The Atlas, the High Court of Admiralty merely alluded to a finding of dual blame and a division of damages "according to the rule of this court", before going on with the question of whether the crew of one of the ships had wrongfully caused extra damages by abandoning the ship following the accident. Again, the question of unequal degrees of fault was not touched by the court.

During the discussion in The Atlas wherein the above English cases were cited, the court noted that it, as other Admiralty Courts of that day, was merely searching for the just and equitable result in any given case.

> "Disasters of the kind occur from different causes and under very different circumstances, and the *rules of Admiralty law applicable to the determination of such controversies vary to meet the varying circumstances which give rise to the accident.*" (93 U.S. at p. 312; emphasis added)

In explaining why equal division appeared most practical to it in cases of mutual fault, the court declared:

> "Strict justice would require * * * that the burden of making

good the loss should fall upon the two delinquents in proportion to their delinquency, but in practice the proportion is impossible to be ascertained." (93 U.S. at p. 314)

Yet the court did not consider the possibility of the two "rules" existing concurrently. In suggesting that equal division was proper where fault was mutual, the court apparently proceeded under the assumption that only one principle could be applied by a court and thus dismissed proportional division as too difficult to apply in that era. But considering the clear acceptance by the court of the admiralty concept of inherent flexibility, coupled with the admission that "strict justice" would require proportional division, it is all but impossible to accept an interpretation of the case which suggests that proportional division is barred where respective degrees of fault can be and have been ascertained. Such an interpretation is completely inconsistent with the precept of admiralty flexibility in which the court clearly and specifically concurs. The case only suggests that in the majority of then current admiralty collisions, specific degrees of proportional fault would be difficult to ascertain.

The case of Atlee v. Union Packet Company, 88 U.S. (21 Wall.) 389, 22 L. Ed. 619 (1874), orally cited to this court by libelant at the hearing on the motions to amend and vacate, contains nothing more than a holding that when a ship strikes a stationary object (in that case a pier) in navigable waters, a suit in admiralty may be maintained and all the rules attending collision in admiralty, including equal division of damages "when both have been at fault" apply. It does not stand for, nor does it suggest, a rule that damages must be equally divided where a *specific* finding of degrees of fault can be and has been made.

Nor is any bar to this court's holding posed by The North Star, 106 U.S. (16 Otto) 17, 1 S.Ct. 41, 27 L.Ed. 91 (1882),

another case often cited in connection with the "equal division" principle. Here again a lower court, specifically the circuit court on appeal, had held only that both vessels were at fault, without any finding of specific degrees of fault. The Supreme Court affirmed that finding and concerned itself almost entirely with the mechanical question of how the decree should be framed so as accurately to reflect the holding. The language of the court concerning the equal division principle again is important only insofar as it approves its use by the lower court in a case where the only finding was that both vessels were at fault and nothing more.

Finally, in The Eugene F. Moran, 212 U.S. 466, 29 S.Ct. 339, 53 L.Ed. 600 (1908), the problem presented concerned division of damages among four vessels found to be at fault in a collision, where three of the vessels were bound together in a flotilla and more than one of the vessels were owned by the same person. After holding all four vessels, separately, at fault, the district court divided the damages equally, and the circuit court certified the question of division to the Supreme Court. No finding had been made respecting possible degrees of blame. In allowing the equal division of damages despite the flotilla and common ownership, Mr. Justice Holmes, writing for the court, noted simply:

"There is nothing stated sufficient to reopen the question, if there is one, as to changing the apportionment when there are different degrees of blame." (212 U.S. at 476, 29 S.Ct. at 341, citing The Atlas, supra.)

Clearly, then Atlee v. Union Packet Company, The North Star, and The Eugene F. Moran do not expand or modify in any way the conclusions reached in our examination of The Catharine and The Atlas, supra.[6]

6. See also *dictum* in Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), where the Supreme Court makes passing reference to the "established admiralty doctrine" in collision cases that *mutual* wrongdoers must share all damages equally.

It is important also to note that the Supreme Court opinions discussed above, especially the Atlas and the Catharine, were predicated upon factual determinations that the collisions there involved had been caused by the "mutual" fault of the parties thereto. By way of distinction, this court found the collision here to have been caused *not* merely through the mutual fault of the parties, but *more* through the fault of one (the vessel) than the other (the City), with specific determination of degree. Indeed, had the vessel in the case at bar been piloted competently and had it been traveling at the required lower speed, the accident might well have been avoided.

While the lexicographers define "mutual" as something joint in nature, the definitions also preponderate in favor of *equal* contribution or participation.[7] Even, however, if the word be taken to mean something broader in scope than precisely equal contribution, it clearly does not prevent an adjudication of *degrees* of mutuality or contribution. Thus any case allowing, or even requiring, an equal division of damages in cases of "mutual" fault would not control a situation such as the case at bar, where the fault has been specifically found to be either (i) something other than mutual, or (ii) mutual in specific proportional degrees, depending on precisely which meaning of "mutual" should be adopted. This court has decreed apportionment of liability in the case at bar, based upon specific findings of degrees of fault, and not upon a general finding of mutual fault. As heretofore noted, the relevant Supreme Court cases impose no bar to such a holding. In fact, such a decision seems wholly consistent with the demands of "strict justice" which the court in The Atlas admits require proportional division among "two delinquents".

### III.

In rendering this opinion, based upon examination of both the controlling decisions and the general requirements of admiralty, that it is free to apportion damages based upon respective degrees of fault where it has found the parties to have contributed to a collision in unequal degrees, this court has found a number of other courts which have shared its views. While they may express the opinion that they are required to apply equal division to cases of collision caused by unequal degrees of fault, they have consistently chafed under the unfairness of such a result.

In The Margaret, 30 F.2d 923 (3d Cir., 1928), the Court of Appeals for the Third Circuit, on appeal from a district court decree holding both ships involved in a collision to have negligently contributed to it and dividing damages equally, modified that decree by apportioning damages three-fourths to one-fourth based upon the comparative degrees of concurrent fault. Subsequently, the court

"Experiencing a growing doubt, *not as to its power to make the order apportioning damages,* but as to its conduct in not literally and respectfully following the moiety [equal division] rule which the Supreme Court has from time to time applied * * * of its own motion, called for a rehearing on the sole question of division of damages." (30 F.2d at 928; emphasis added)

Thereupon, the court modified the decree again and reinstated the equal division holding of the district court,

" * * * wholly aside from whatever views it [the Court of Appeals] may have on the subject * * *."

In Ahlgren v. Red Star Towing & Transportation Co., 214 F.2d 618 (2d Cir., 1954) a personal injury admiralty case, Judge Frank, in *dictum*, commented upon the unfairness of applying equal-division to all property damage admiralty cases:

"The admiralty rule of evenly-divided damages in cases of injury

7. Webster's New International Dictionary, Unabridged (2d Ed. 1953).

to property * * * has frequently received criticism as unfair. On that ground, virtually every country except ours has abandoned it." (214 F.2d at pp. 620–621)

Yet, he also went on to say that he felt obliged to follow it until Congress or the Supreme Court directed otherwise.

In re Adams' Petition, 125 F.Supp. 110 (D.C.S.D.N.Y., 1954) involved a collision between two ships in New York harbor. One libelled the other for its damage but no cross-libel was filed. In its original decree, the court held respondent's vessel responsible to the extent of 80 per cent of the total fault and libelant's vessel at fault to the extent of the remaining 20 per cent and apportioned the damage accordingly. Following the chronology of the case at bar, both parties moved for reargument, "agreeing" that a mandatory 50–50 division was required in the absence of application of the "major-minor fault" rule. The court there also rejected application of the "major-minor fault" rule because of the substantial fault of the would-be "minor" offender. However, after an excellent analysis of the problem involved, the court reluctantly bowed to the view of the Second Circuit, expressed by Judge Frank, that it was not free to approve any other "rule" than that of equal division, and modified its Findings of Fact and Conclusions of Law to conform to the equal division principle. Admitting the "inherent injustice of this rule," the Second Circuit nonetheless affirmed *per curiam* such division of damages, In Re Adams' Petition, 237 F.2d 884 (2d Cir. 1956).

The injustice of equal division has been pointed out by a jurist no less eminent than Learned Hand, dissenting from another Second Circuit admiralty equal division property damage holding:

"Is it out of place to point out that the suit is one more illustration of our strange obstinacy in clinging to the division of damages and refusing to apportion them? This has become even more egregious, when we reflect that, where personal injuries are in issue, we do follow the more enlightened doctrine, now in force in most countries." [8]

And the very harshness of the result of refusal to apportion has never been more succinctly expressed than as follows:

"There may be occasions when blame is not correctly apportioned —perfection is not of this world. * * * Where the Court says one-third where it should have been one-fourth, it is a mistake of the Court: —and even the best judge is not beyond the reach of error. But where the judge, although seeing and saying that the faults are not at all equal is nevertheless compelled to make the burden of damages equal, justice fails."[9]

IV.

Thus it is seen that the general interpretation of the Supreme Court cases discussed above has resulted in holdings which, despite grave misgivings, have applied equal division to every type of collision case. As noted by the opinions supporting these holdings, the normal product of applying equal division to cases of unequal fault has been manifest injustice. Certainly, our Supreme Court in first applying the principle never intended to cause such harsh results in the future.

Our Supreme Court in first applying equal division was, as we have seen, in large part merely presenting its interpretation of the then current practice of the English Admiralty courts. That practice, however, while described as an attempt to escape the harsh common law total bar against a contributory wrongdoer and to substitute equitable distribution of losses among concurrent

8. Dissenting in Ulster Oil Transport Corp. v. The Matton No. 20, 210 F.2d 106, at 110 (2d Cir., 1954).

9. In Re Adams' Petition, D.C., 125 F.Supp. 110 at 113, citing Franck, Collisions at Sea in Relation to International Maritime Law, 12 L.Q.Rev. 260, 263 (1893).

wrongdoers, was never meant as an inflexible iron-clad formula to be applied in all events.[10] No doubt fully aware that an inflexible application of equal division could, if applied in all events, result in such inequities as to be wholly inconsistent with the traditional flexibility of Admiralty, England rejected such an application by becoming a party over fifty years ago to a treaty which specifically insured that such injustice would not occur. In 1910, it ratified the Brussels Collision Convention which provides, in part:

> "If two or more vessels are in fault the liability of each vessel shall be in proportion to the degree of faults respectively committed. Provided that if, having regard to the circumstances, it is not possible to establish the degree of respective faults, or if it appears that the faults are equal, the liability shall be apportioned equally.[11]

It is interesting to note the similarity between the language of this provision in the convention and the language of the Supreme Court in the Atlas quoted above.

This country has not ratified the convention while almost every other major maritime country in the world has become a party.[12] It has been said that the failure to ratify was predicated upon American opposition to other provisions of the treaty, and/or a misunderstanding by Congress of the original translation, rather than opposition to the proportional damages principle.[13] But in any event, it seems clear that the legal concepts and precedents of American admiralty present no bar to the application of proportional division, in cases where the facts are such as to warrant its use.

## V.

As noted by Learned Hand, this country does indeed follow a proportional damage division principle where personal injury arises out of a maritime tort. It also follows a similar rule in cases of death occurring on the high seas. For many years this principle has been codified by statute.[14] In both situations, the statutes provide for what is, in effect, a proportional diminution of damages in accord with the degree of fault attributable to the contributory negligence of the plaintiff, or the plaintiff's decedent, as the case may be.

While the context of a personal injury or death case differs from that of a collision case, the exact question for decision is the same in personal injury, death or collision. The court is bound to decide, in effect, where and in what proportion the loss must fall. Thus, in cases arising under the statutes referred to above, the court is *bound* to determine the degrees of fault where there has been fault by both parties, while in property damage collision cases, many courts, as discussed above, have felt themselves bound to apply equal division, no matter what the degrees of fault. The task of ascertaining degrees of fault is not new to American courts; they have been doing it for years by authority of statute and before that without it, in personal injury and death cases. Any argument then which predicates mandatory equal division in all collision cases on the assumption of the impossibility or difficulty in ascertaining degrees of fault

---

10. See Huger, The Proportional Damage Rule in Collisions at Sea, 13 Cornell L. Q. 531 (1928).

11. Translation of Article 4 submitted in 1937 to the Congress of the United States from 6 Benedict, Admiralty, 4 (6th Ed. 1940).

12. Staring, Damages in Admiralty, Note 2, supra. Ahlgren v. Red Star Towing & Transportation Co., 214 F.2d 618 (2 Cir. 1954).

13. Staring, Damages in Admiralty, Op. cit. supra, In Re Adams' Petition, 125 F. Supp. 110, 115 (D.C.S.D.N.Y., 1954); Robinson, Handbook of Admiralty Law 854 (1939).

14. Regarding personal injuries see the "Jones Act", 46 U.S.C.A. § 688, 45 U.S. C.A. § 53. Regarding death, see § 6 of the "Death on the High Seas Act", 46 U.S.C.A. § 766.

must fail, and most certainly so where degrees of fault are in fact ascertainable.

## VI.

In the Max Morris, 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586 (1890), the question of the effect of the contributory negligence of a libelant claiming compensation for personal injuries in admiralty was first presented to the United States Supreme Court. Libelant was a stevedore loading coal on the Max Morris when partly through his own negligence and partly through the negligence of the ship's officers, he fell off an upper deck and was injured. The district court, which had made the initial finding of dual fault, divided damages by charging to libelant's own fault his pain, suffering and consequential damages and charging to the vessel libelant's wages for the time lost from work. It is not clear whether such division was equal or unequal, although it does appear that no finding of specific degrees of fault was made. The circuit court affirmed and appeal was taken to the Supreme Court. On appeal, the parties stipulated agreement that there had been fault on both sides, and the Supreme Court indicated that the primary question presented to it was whether libelant was completely barred by his own contributory negligence. The court held that contributory negligence was not a complete bar and that the divided damage decree should be affirmed.

For our purposes, the key factor to be considered regarding The Max Morris is that it has been cited as and is in fact authority for unequal division of damages in all types of admiralty cases.[15] Discussing the principle of equal division which had been used in property damage admiralty collision cases, and citing the same English House of Lords case discussed in The Atlas, supra [16], the Court said:

"The rule of the *equal apportionment* of the loss where both parties were in fault *would seem to have been founded upon the difficulty of determining, in such cases, the degree of negligence in the one and the other*. It is said * * * that such rule of division is a rustic sort of determination, and such as arbiters and amicable compromisers of disputes commonly follow, where they cannot discover the motives of the parties, or when they see faults on both sides." (137 U.S. at p. 12, 11 S.Ct. at p. 32; emphasis added)

The court went on to note that in personal injury admiralty cases, the lower courts had freely apportioned damages at their "conscientious discretion." While the court only faced the question of damages in personal injury cases, the following language, quoted with strong approval by it, can well be read as a directive to all admiralty courts in all types of cases:

"Even in cases of marine torts, independent of prize, *courts of admiralty are in the habit of giving or withholding damages upon enlarged principles of justice and equity*, and have not circumscribed themselves within the positive boundaries (sic) of mere municiple (sic) law * *. *In the admiralty, the award of damages always rests in the sound discretion of the court, under all the circumstances*." (137 U.S. at p. 13, 11 S.Ct. at p. 32; emphasis added)

Indeed, there are a number of American courts which have, despite the contention that equal division is mandatory, apportioned damages unequally, based upon express findings of specific unequal degrees of fault. The Mary Ida, 20 F. 741 (D.C.S.D.Ala.1884), a collision case; The No. 6H, 108 F. 429 (D.C. E.D.N.Y.1901); Tracy Towing Line v. City of Jersey City, 105 F.Supp. 910 (D. C.N.J.1952); Marine Fuel Transfer Corp. v. The Tug Ruth, 135 F.Supp. 371 (D.C.E.D.N.Y.1955), also a collision case, the latter despite the opposite in-

15. Griffin, Collision, note 3 supra § 245; Staring, Contribution and Collision, note 2 supra, at p. 343.

16. Hay v. Le Neve (1824), 2 Shaw H. of L. 395.

clinations of the Second Circuit, noted above. In addition, one text writer reports the existence of some unreported cases where damages were divided in proportion to the degree of fault in property damage collisions.[17] In Hudson v. Pittsburgh Plate Glass Co., 263 F. 730 (D.C. W.D.Pa.1911), the court, in a case where libelant's ship had sunk from striking cinders negligently placed in shallow water by respondent harbor-owner, but where the ship was also found to be negligent, cited the Max Morris, supra, and said:

> "There is no fixed rule as to an equal division of the damages; the proportion of division being decided by the facts of each particular case. In this case, it is impossible to fix or measure the proportion of loss resulting from the negligence of each, and therefore we are of opinion that the damages and costs should be equally divided." (263 F. at p. 733; emphasis added)

## VII.

In view of the fact that our Supreme Court has never ordered equal division of damages in any case where the findings were specific that the respective degrees of contributing fault were unequal, this court is free in this case to apportion damages unequally, based upon the specific unequal degrees of contributing fault of which it has found each party to have been guilty. It has always been the policy of the Supreme Court that a court of admiralty has the discretion, flexibility and duty to do the complete justice inherent in the historical role of the maritime court.

### JUDGMENT ORDER

This matter coming on to be heard on the motions of the libelant and respondent to amend the Findings of Fact and Conclusions of Law heretofore entered in this proceeding and to vacate the Judgment Order entered on May 21, 1962, and the Court having entered its Memorandum Opinion on the issues raised by the said motions, and the Court being fully advised,

IT IS HEREBY ORDERED, ADJUDGED and DECREED AS FOLLOWS:

1. The respective motions of the libelant and respondent to amend the Findings of Fact and Conclusions of Law entered on May 21, 1962, be and the same hereby are denied.

2. The respective motions of the libelant and respondent to vacate the Judgment Order entered on May 21, 1962 in this cause, be and the same hereby are denied.

### FINAL JUDGMENT ORDER

This matter coming on to be heard pursuant to the Findings of Fact, Conclusions of Law, and Judgment Orders heretofore entered on May 21, 1962 and September 25, 1962, and the matter having been called for hearing before this Court on September 25, 1962, for the assessment of damages pursuant to the said Findings of Fact and Conclusions of Law and Judgment Orders, and the parties having stipulated and agreed in open court that the amount of damages sustained by the Libelant N. M. Paterson & Sons, Limited, by the occurrence complained of in this cause was $15,336.00, and the parties having stipulated and agreed in open court that the amount of damages sustained by the Respondent-Petitioner City of Chicago by reason of the occurrence complained of in this cause was $9,000.00;

AND THE COURT HAVING FOUND pursuant to the said stipulations that the amounts of damages sustained by the said parties, respectively, are as set forth in the said stipulations, and the Court having found that the total of the damages sustained by the respective parties by reason of the occurrence complained of in this cause was $24,336.00, and the Court having found that the portion of the said total amount which constitutes one-third of the said total damages is the amount of $8,112.00,

17. Griffin, Collision, supra, § 247.

and the Court having found that the portion of the said total amount which constitutes two-thirds of the said total damages is the amount of $16,224.00;

AND THE COURT HAVING CONCLUDED in accordance with its Findings of Fact, Conclusions of Law, and Judgment Orders heretofore entered in this cause that the libelant, N. M. Paterson & Sons, Limited, a corporation, is liable for the sum which constitutes two-thirds of the total of the respective damage amounts sustained by the parties by reason of the occurrence complained of in this cause;

AND THE COURT HAVING CONCLUDED in accordance with its said Findings of Fact, Conclusions of Law, and Judgment Orders heretofore entered, that the respondent-petitioner, City of Chicago, a municipal corporation, is liable for the sum which constitutes one-third of the total of the respective damage amounts sustained by the parties by reason of the occurrence complained of in this cause;

And the Court being otherwise fully advised;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1. The libelant, N. M. Paterson & Sons, Limited, be and the same is hereby awarded damages against the respondent-petitioner, City of Chicago, a municipal corporation, in the amount of $8,112.00.

2. The respondent-petitioner, City of Chicago, a municipal corporation, be and the same hereby is awarded damages against libelant, N. M. Paterson & Sons, Limited, a corporation, in the amount of $16,224.00.

3. Execution shall issue in favor of respondent-petitioner, City of Chicago, a municipal corporation, and against libelant, N. M. Paterson & Sons, Limited, a corporation, in the amount of $888.00.

4. No execution shall issue in this cause other than that specified in paragraph 3 of this decree.

5. Libelant and respondent-petitioner be and they are hereby adjudged responsible for their own costs, and no costs shall be assessed in favor of either of said parties against the other.